

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-13-1996

# Virgin Islands v. Weatherwax

Precedential or Non-Precedential:

Docket 95-7126

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

## Recommended Citation

"Virgin Islands v. Weatherwax" (1996). *1996 Decisions.* Paper 216.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/216

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 95-7126


GOVERNMENT OF THE VIRGIN ISLANDS,
Appellant

v.

WILLIAM WEATHERWAX



District Court of the Virgin Islands
Division of St. Croix
(D.C. Crim. Action No. 88-cr-00139)


Argued August 16, 1995

BEFORE:  STAPLETON, LEWIS and WEIS, <u>Circuit Judges</u>

(Opinion Filed   March 13, 1996)

W. Ronald Jennings
United States Attorney
Charles L. Jenkins (Argued)
Assistant U.S. Attorney
1108 King Street, Suite 201
Christiansted, St. Croix
U.S. Virgin Islands 00820

Attorneys for Appellant


Amelia Headley-LaMont (Argued)
Headley-LaMont & Marshack
4500 Sunny Isle Professional Building
Suite 4
P.O. Box 1690 Kingshill
Christiansted, St. Croix
U.S. Virgin Islands 00820-4423

Attorney for Appellee

STAPLETON, Circuit Judge:

This is the second time that this habeas corpus proceeding has been before us. In the previous appeal, Government of the Virgin Islands v. Weatherwax, 20 F.3d 572 (3d Cir. 1994), we reversed the district court's dismissal of Weatherwax's petition for a writ of habeas corpus and remanded for an evidentiary hearing on Weatherwax's claim of ineffective assistance of counsel. After holding the evidentiary hearing, the district court granted Weatherwax's petition for habeas relief. We will reverse.

I.

William Weatherwax was indicted for the shooting death of St. Clair Hazel. A jury acquitted him of first degree murder but convicted him of second degree murder and unlawful possession of a weapon. We affirmed on direct appeal. Government of the Virgin Islands v. Weatherwax, 893 F.2d 1329 (3d Cir. 1989).

Weatherwax thereafter filed a petition for a writ of habeas corpus, raising several arguments. Only one of those arguments is relevant to this appeal. Weatherwax alleged that during his trial a juror was observed with a newspaper containing an article about the trial. The article allegedly reported an

inaccurate and unfavorable account of Weatherwax's testimony. Both Weatherwax and members of his family informed defense counsel of this fact but the lawyer failed to bring the matter to the trial court's attention. Weatherwax claimed that his attorney's failure to bring this matter to the court's attention constituted ineffective assistance of counsel.

The district court rejected that argument, reasoning that the newspaper article was "a verbatim and dispassionate account of the testimony adduced at trial" which accordingly could not be prejudicial. Weatherwax, 20 F.3d at 575. We came to a different conclusion, however, finding that the actual trial testimony varied from the newspaper account in several significant respects. We found that the difference between the article version and the official transcript, "[a]lthough subtle," could have been unfairly prejudicial because Weatherwax's testimony (but not the newspaper account) "argue[d] against second degree murder and support[ed] Weatherwax's self-defense testimony." Id. at 577.[0]

We further found that "[i]f the jurors . . . read the damaging article with its distorted reporting of Weatherwax's testimony, the likelihood of resulting taint to the fairness of the trial [would be] apparent [and] Strickland's second prong would also be met." 20 F.3d at 580. We, therefore, instructed that if the district court found on remand (1) that a juror in

---

[0] The article reported only on the testimony the jury had heard the preceding day; it included no extra-record information about Weatherwax or the crime.

4

fact had brought the newspaper into the jury room and (2) that Weatherwax's lawyer had been informed of this, then Weatherwax would have "made out a prima facie case of ineffective assistance of counsel under the Strickland [v. Washington, 466 U.S. 668 (1984),] standard." Id. If such a "prima facie" case were established on remand, we instructed that, "[t]he government must then be afforded the opportunity to question Weatherwax's counsel relative to his failure to request the voir dire in order to show, if applicable, that counsel proceeded on the basis of 'sound trial strategy.'" Id. (quoting Strickland, 466 U.S. at 689).

On remand, the government did not contest Weatherwax's claims (1) that a juror in fact had had possession of a newspaper in the jury room and (2) that Weatherwax's lawyer had been informed of this. Thus, Weatherwax made out a prima facie case of ineffective assistance of counsel under Strickland, and the burden shifted to the government to show that Weatherwax's counsel had proceeded on the basis of "sound trial strategy." Id.

To meet its burden, the government called Weatherwax's trial attorney, Michael Joseph. In response, Weatherwax called his sister and his brother-in-law, who were present during the trial, and gave his own account of the relevant events. With the sole exception noted below, the testimony of these witnesses was not in conflict.

Joseph, an experienced criminal defense lawyer and a lifelong resident of the Virgin Islands, was privately retained

by Weatherwax.  Weatherwax stayed with Joseph in his home during the last few days of pretrial preparation and throughout the trial.  Joseph considered it "a very difficult case."  (J.A. at 23.)  Among other things, he explained to Weatherwax the strategy he intended to use in selecting a jury.  That strategy was based in part on the fact that Weatherwax's case had created a racially charged atmosphere in the Virgin Islands because Weatherwax was white, a so-called "Continental," and the victim was black.  It was also based on the facts surrounding the victim's death and Weatherwax's anticipated defense.  Joseph testified:

> Q. [D]id you have a strategy, sir, with regard to selecting a jury?
>
> A.  Of course.
>
> Q.  And what was that strategy?
>
> A.. . . I saw this case as a case in which the facts really were not too much in dispute as compared to the jury that would hear the facts and interpret the facts.  For instance, it would be undenied that an unlicensed firearm was involved.  It would be undenied that Mr. Weatherwax possessed an unlicensed firearm.  It would be undenied that Mr. Weatherwax discharged an unlicensed firearm. It would be undenied that the person who was shot did not have a firearm.  And it would be undenied that there would be witnesses who would have conflicting stories as to what danger he presented to Mr. Weatherwax. Therefore, I thought Mr. Weatherwax's perception as to what was happening to him, which is the gist of a self defense case, not what's really happening but whether the person reasonably perceived themselves to be in danger was the gist of this case and we needed jurors who would identify with that situation.

> * * * *

6

Q. What were you striving to achieve in the composition of the Weatherwax jury?

A. Sympathy.

Q. And were you doing that based upon the profile of certain venire persons?

A. Absolutely.

Q. What were you looking for specifically?

A. I was looking for as many Continentals on the jury as possible.

Q. And for what reason did you do that?

A. Sympathy.

Q. Is that another way of saying you would assume that they identified with the defendant?

A. Absolutely.

(J.A. at 23-24, 26-27.)

Joseph further testified that a second objective of his trial strategy was to persuade the jury to convict only on a lesser included offense in the event the evidence of self defense did not produce an acquittal on all counts.

The jury ultimately selected to hear Weatherwax's case consisted of three white and nine black jurors. It was the largest number of Continentals Joseph had ever seen on a Virgin Islands jury and he was "ecstatic." (J.A. at 28.)

On numerous occasions during the trial, the trial judge admonished the jury to avoid reading articles about the trial in the newspaper. He did not, however, instruct them not to read a newspaper.

7

On the morning of the last day of the trial, after Weatherwax had finished his testimony and just as the prosecution was about to call its rebuttal witnesses, Weatherwax's sister, Sally Lay, and his brother-in-law, William Lay, observed a juror walk from the jury room into the court room with a local newspaper under his arm. They did not observe him reading the newspaper and, accordingly, did not know what portion of the paper the juror had been exposed to. Mr. and Mrs. Lay advised Weatherwax and a bailiff of their observation. The bailiff took no action but advised them to speak to their lawyer.

The Lays, Weatherwax, and several other members of his family took the bailiff's advice and informed Joseph about the newspaper as he was entering the door of the courtroom. A conversation ensued. Weatherwax expressed the view that it was "not right" for the juror to have a newspaper and he as well as his relatives asked Joseph to do something about it. (J.A. at 64.) Mrs. Lay described the conversation and Joseph's response in the following terms:

> Q. You didn't ask anything -- all I'm asking you, ma'am, is you didn't ask him to do anything specific. You just asked him to do something about it?

> A. We asked him to do something about it, file a motion or something and he said he would file a motion for a mistrial tomorrow.

> * * * *

> Q. And that's not all he said, did he? He said something else didn't he?

> A. In this conversation?

> Q. Yes.

8

A. Yes, he did.

Q. What did he say?

A. He said that he -- well, he said a lot of things during the course of the conversation.

Q. As specifically as you can recall, Mrs. Lay, I would like for you to tell the Court everything that Mr. Joseph said.

A. He said that the jury [sic] with the newspaper is a white man.  He would help Billy's case.  He was on our side.  Leave it alone.  He would file a motion for a mistrial tomorrow.

Q. So he told you essentially not to worry about it, didn't he?

Ms. Lamont:  Objection.

The Court:  It's cross examination.  Ask her that question before you go on to something else.

By Mr. Humphreys:

Q. You may answer the question. Attorney Joseph told you not to worry about the situation, didn't he?

A. No, he did not use those words.

Q. But he did tell you, as a matter of fact, that he believed that the juror that you had identified was "on your side," didn't he?

A. Yes.

Q. And he also told you not to bring any attention to it, didn't he?

A. Yes.

(J.A. at 67-68.)  Neither Weatherwax nor his family thereafter brought the newspaper to the attention of the court.

9

Joseph testified that he had monitored the newspapers daily for inflammatory material and that he had read the article in that morning's paper before coming to court.  He described in the following terms his reaction upon being advised of the Lays' observation:

> A.. . . So telling me a juror has a newspaper and walk [sic] into court tells me -- my impression was that's a pretty honest man.
>
> Q.Why was he an honest man?
>
> A.Because if he wanted assistance from the newspaper as to what is happening in court, he would have read it clandestinely. He wouldn't have just walked to court like that. Many people in this community love the sports page.  Many people love to do crossword puzzles.  If they don't do their crossword puzzle, they don't have a good day.
>
> Q.Do you believe that the possession of a newspaper, the possession, in and of itself, was a valid basis for a mistrial?
>
> A.Absolutely not.
>
> Q.Was it a valid basis for polling the jury?
>
> A.Not that jury.
>
> Q.Because you wanted that jury?
>
> A.Absolutely.  On another jury I might have used it as an excuse.
>
> Q.So you did not request that the jury be polled?
>
> A.No.
>
> Q.Was that a strategic decision on your part, sir?

10

> A. Of course it was. That's what I'm trying to tell you, sir, that if anybody, including Judge Almeric Christian, had come and tell [sic] me, "Michael Joseph, it is my opinion that you should poll the jury," I would have said, "Your Honor, leave my jury alone."

(J.A. at 37-38.)

The sole conflict in the testimony relates to whether Joseph committed himself during this conversation to the filing of a motion for a mistrial. Mrs. Lay insisted that he did:

> Q. To your knowledge, what was done?
>
> A. Mr. Joseph said that he would take care of it and he would file a motion for a mistrial tomorrow.

(J.A. at 48.)

Joseph testified that he said he would think about the matter but insisted that he did not commit to seeking a mistrial.

> Q. Do you recall ever telling anyone that you might consider a motion for a mistrial?
>
> A. Not only do I not recall not telling anyone that. I would call any lawyer that would have moved for a mistrial on those grounds a fool because of the composition of the jury. It was a rare jury. Probably the odds of such a jury being selected again was nil. And if someone mentioned that to me, I probably would have laughed at them.
>
> I recall telling Billy that it was my opinion that this is the best shot he's getting right here, Mr. Weatherwax, that this jury was about the best jury he would ever get.
>
> Q. Well, let's get inside your thought process. You told the defendant that you would think about it. Did you, in fact, think about it?
>
> A. Of course.

11

Q. Did you come to a conclusion about whether or not it would be important for you to either request a mistrial or request a polling of the jury?

A. Again, it's important that you understand that this had been a jury that left me very happy, with a very happy feeling.

(J.A. at 33-34.)

No motion for a mistrial was filed by Joseph and the newspaper incident was not pursued prior to the filing of this habeas proceeding.

The district court credited Joseph's testimony that he made a deliberate and strategic decision not to pursue the newspaper issue. It concluded, however, that during his conversation with the Weatherwax family he had led them to believe that the issue would be pursued in some way. Specifically, the district court found that "[d]espite giving some assurances that he would 'file a motion,' Attorney Joseph determined that the incident did not warrant interfering with the composition of the jury." (Dist. Ct. Op. at 7.)

Despite its conclusion that Joseph's decision had been deliberate and strategic, the district court nevertheless ruled that Joseph's failure to call the court's attention to the incident of alleged juror misconduct was unreasonable under the Strickland standard for measuring an attorney's performance. It explained:

> [C]ounsel's decision not to notify the court of the juror's misconduct, was in the first instance a breach of a fundamental duty to his client, and in the second, a breach of

12

> his duty as an officer of this court.
> Accepting trial counsel's claim as to a
> strategy, this court finds that the decision
> denied the trial judge, and therefore counsel
> and client, the opportunity to conduct the
> searching inquiry that was required to
> determine the extent of the jury's exposure
> to the extra-judicial evidence. As such, the
> decision cannot be said to have been
> reasonable exercise of professional judgment.

(Dist. Ct. Op. at 16.)

The court then addressed the second prong of the Strickland test and determined that the facts warranted relief under the doctrine of that case. It found that "because of trial counsel's disregard of his client's wishes and his duty to this court, there are no objective criteria upon which this court can determine prejudice, if any, as a result of the juror's misconduct. To the extent that a voir dire was not conducted, proof of prejudice is excused. Since finality concerns are weaker when one of the assurances that the result of the proceeding is reliable is absent, a new trial is warranted." (Dist. Ct. Op. at 17-18.)

II.

We review the district court's findings of fact for clear error. We must make an independent judgment, however, on whether the facts thus found constitute constitutionally ineffective assistance of counsel. McAleese v. Mazurkiewicz, 1 F.3d 159, 166 (3d Cir.), cert. denied, 114 S. Ct. 645 (1993).

13

III.

The district court reasoned that Joseph breached a duty to his client because he (a) failed to take steps necessary to secure a <u>voir</u> <u>dire</u> inquiry directed to the issue of whether the newspaper in fact had prejudiced the jury and (b) failed to consult with or follow directions from his client about strategic matters.  Our <u>de</u> <u>novo</u> review leads us to a contrary conclusion.

A.

We start with the teachings of <u>Strickland v. Washington</u>:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like, <u>e.g.</u>, ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.  Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.  See <u>United States</u> v. <u>Decoster</u>, 199 U.S. App. D.C., at 371, 624 F.2d, at 208. Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause.
>
> * * * *
>
> Judicial scrutiny of counsel's performance must be highly deferential.

14

> . . . A fair assessment of attorney
> performance requires that every effort be
> made to eliminate the distorting effects of
> hindsight, to reconstruct the circumstances
> of counsel's challenged conduct, and to
> evaluate the conduct from counsel's
> perspective at the time. Because of the
> difficulties inherent in making the
> evaluation, a court must indulge a strong
> presumption that counsel's conduct falls
> within the wide range of reasonable
> professional assistance; that is, the
> defendant must overcome the presumption that,
> under the circumstances, the challenged
> action "might be considered sound trial
> strategy."

466 U.S. at 688–89 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

Thus, while professional standards provide guidance in evaluating the performance of counsel, they do not define the boundary between constitutionally acceptable and constitutionally unacceptable performance.[0] The Constitution requires only that counsel's assistance be "reasonable" considering all of the circumstances and the ultimate objective of assuring "vigorous

---

[0] The Supreme Court elaborated on this point in Nix v. Whiteside, stating that:

> [B]reach of an ethical standard does not
> necessarily make out a denial of the Sixth
> Amendment guarantee of assistance of counsel.
> When examining attorney conduct, a court must
> be careful not to narrow the wide range of
> conduct acceptable under the Sixth Amendment
> so restrictively as to constitutionalize
> particular standards of professional conduct
> and thereby intrude into the state's proper
> authority to define and apply the standards
> of professional conduct applicable to those
> it admits to practice in its courts.

475 U.S. 157, 165 (1986).

advocacy of the defendant's cause." Id. at 689. Moreover, the evaluation of reasonableness must begin with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id.

Applying these principles in Strickland, the Supreme Court discussed the interplay between an attorney's duty to investigate a matter and her strategic choices regarding that matter:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Id. at 690-91.

In a sense, Joseph made his strategic choice not to move for a mistrial "after less than complete investigation"; he decided that it would be better to keep the jury intact without first inquiring into whether the jurors read or were influenced by the newspaper article. Still, Joseph's decision not to investigate the possibility of juror prejudice was itself a strategic decision. Unlike the usual case where a lawyer fails to fully investigate a matter, Joseph could not conduct an investigation without first bringing the newspaper incident to

16

the court's attention. Once he brought the matter to the court's attention, however, he would relinquish to the court at least some control over whether this particular jury would decide his client's fate.

Given the limited information that Joseph had in front of him -- that a juror had been seen with a newspaper, and that the newspaper contained a potentially damaging article -- and given Joseph's view that this jury was the best that could be expected from Weatherwax's point of view, we think that the decision not to inform the court was reasonable "under prevailing professional norms." Strickland, 466 U.S. at 688. Joseph acted in what he believed to be his client's best interests. He believed that he had the best jury possible under the circumstances, and he made a judgment that many competent litigators would make under the same circumstances. Bringing the newspaper incident to the court's attention would have created a possibility that the court would either declare a mistrial or otherwise alter a jury which Joseph felt favored the defense.[0] Given the Supreme Court's statement that "[t]here are countless

_____

[0] We do not agree with the dissent that Joseph could have satisfied his client's request without substantial risk of losing what he believed to be a favorable jury. "In every case where the trial court learns that a member or members of the jury may have received extra-record information with a potential for substantial prejudice, the trial court must determine whether the members of the jury have been prejudiced." Government of the Virgin Islands v. Dowling, 814 F.2d 134, 139 (3d Cir. 1987). Thus, had Joseph brought the newspaper incident to the trial court's attention, the court would have had an affirmative obligation to conduct voir dire and would have had discretion, if it found exposure to the article, to excuse one or more jurors or to declare a mistrial.

17

ways to provide effective assistance in any given case," and the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," id. at 689, we cannot, without more, rule that Joseph's decision not to investigate further was unreasonable as a matter of strategy.[0]

---

[0] Unlike our dissenting colleague, we do not view as inherently unreasonable Joseph's judgment that it was in Weatherwax's interest to have a jury including three white jurors rather than one having fewer or no white jurors. Lawyers necessarily make trial strategy judgments based on probabilities. While they occasionally have hard empirical data to rely upon, the probabilities they utilize are more frequently based on an assessment of human nature rooted in the lawyer's own personal experience. Weatherwax had testified that the victim started coming at him with a rock and that he feared for his life. Joseph believed that, as a matter of probability, jurors of Weatherwax's own racial background would be more likely to identify with Weatherwax and believe his fear to be genuine than would jurors of the victim/assailant's racial background. There is no way to determine whether Joseph's belief is empirically accurate. It has not been shown to be empirically inaccurate, however, and we are unwilling to say that it is a view that a reasonable attorney could not hold.

The Supreme Court has held that neither the prosecution nor the defense may, consistent with the Equal Protection Clause, utilize state-created peremptory challenges to exclude jurors from service on a jury because of their race. Batson v. Kentucky, 476 U.S. 79, 96-98 (1986); Georgia v. McCollum, 505 U.S. 42, 59 (1992). The Supreme Court has never concluded, however, that aversions and affinities arising from the attitudes and experiences of different racial groups do not exist or that they do not affect jury verdicts. There is some empirical evidence to the contrary. E.g., McCleskey v. Kemp, 481 U.S. 279, 287 (1987) (discussing a study indicating that black defendants who kill white victims have the greatest likelihood of receiving the death penalty); Jeffrey S. Brand, The Supreme Court, Equal Protection, and Jury Selection: Denying That Race Still Matters, 1994 Wis. L. Rev. 511, 628 n.584 (noting that studies have found that the likelihood of a decision to acquit is correlated to the race of the juror and of the defendant); id. at 619, 630 (arguing that, because of the way racism operates in the courtroom, a minority defendant ought to be able to use race-based peremptory challenges to increase minority participation on the jury); Nancy J. King, Postconviction Review of Jury Discrimination: Measuring

18

B.

The district court also found that Joseph's representation was ineffective because he failed to follow direction from or fully consult with his client when he decided not to bring the newspaper incident to the court's attention.

There is general agreement in the case law and the rules of professional responsibility that the authority to make decisions regarding the conduct of the defense in a criminal case is split between criminal defendants and their attorneys.  See Jones v. Barnes, 463 U.S. 745, 751 (1983); United States v. Teague, 953 F.2d 1525, 1531 (11th Cir.), cert. denied, 113 S. Ct. 127 (1992); 1 American Bar Association Standards for Criminal Justice § 4-5.2 (2d ed. 1980 & Supp. 1986) [hereinafter ABA Standards].  While this general proposition is more clear than precisely where to draw the dividing line, the Supreme Court has provided some guidance that helps to narrow the issue.

the Effects of Juror Race on Jury Decisions, 92 Mich. L. Rev. 63, 80-99 (1993) (reviewing studies reporting that juror race influences jury decisions); Sheri Lynn Johnson, Black Innocence and the White Jury, 83 Mich. L. Rev. 1611, 1616-43 (1985) (discussing research reporting influence of juror racial bias on the determination of guilt); see also McCollum, 505 U.S. at 61 (Thomas, J., concurring) (recognizing the broad perception, confirmed by "[c]ommon experience and common sense," that "conscious and unconscious prejudice persists in our society and that it may influence some juries"); id. at 68 (O'Connor, J., dissenting) ("It is by now clear that conscious and unconscious racism can affect the way white jurors perceive minority defendants and the facts presented at their trials, perhaps determining the verdict of guilt or innocence.").  Nor has the Supreme Court ever held that ineffective assistance of counsel occurs whenever an attorney exercises his or her professional judgment based on the belief that such aversions and affinities may influence a jury's verdict.  We do not believe it would so hold if presented with this case.

19

In _Jones_, the Supreme Court held that although a criminal defendant has an equal access right to an appeal under the Due Process and Equal Protection Clauses, he has no constitutional right to insist that appellate counsel advance every non-frivolous argument the defendant wants raised. 463 U.S. at 754. The Court's review of its prior jurisprudence in _Jones_ reflected a recognition that "the accused has the ultimate authority to make certain fundamental decisions regarding the case." _Id._ at 751. As examples of those "fundamental decisions," the Court pointed to the decisions concerning whether to plead guilty, to waive the right to trial by jury, to testify in one's own behalf, to take an appeal, or to waive the right to counsel. _See also_ _Faretta v. California_, 422 U.S. 806, 834 (1975).

In support of its analysis, the _Jones_ Court referred to ABA Model Rule of Professional Conduct 1.2(a), which reserves decisions on fundamental matters to the client, and then expressly recognized the complementary proposition that non-fundamental decisions are to be made by counsel on the basis of his or her professional judgment exercised after consultation with the client:

> "A lawyer shall abide by a client's decisions concerning the objectives of representation . . . and shall consult with the client as to the means by which they are to be pursued. . . . In a criminal case, the lawyer shall abide by the client's decision, . . . _as to a plea to be entered, whether to waive jury trial and whether the client will testify._" Model Rules of Professional Conduct, Proposed Rule 1.2(a) (Final Draft 1982) (emphasis added).

> With the exception of these specified fundamental decisions, an attorney's duty is to take professional responsibility for the conduct of the case, after consulting with his client.

463 U.S. at 753 n.6.

The ABA Standards for Criminal Justice recognize as being among the non-fundamental issues reserved for counsel's judgment "whether and how to conduct cross-examinations, what jurors to accept or strike, [and] what trial motions should be made . . . ." ABA Standards § 4-5.2(b). Several courts have also recognized witness selection as being among the non-fundamental decisions that counsel is entitled to make at trial. E.g., United States v. Long, 674 F.2d 848, 855 (11th Cir. 1982) (holding that counsel's failure to call alibi witnesses was not ineffective assistance and stating: "This Court will not second-guess tactical decisions of counsel in deciding whether to call certain witnesses."); State v. Davis, 506 A.2d 86, 92 (Conn. 1986) (holding that counsel's refusal to call a witness that his client had instructed him to call did not violate defendant's right to compulsory process); People v. Deere, 710 P.2d 925, 931 (Cal. 1985) (in bank); Wainwright v. Sykes, 433 U.S. 72, 93 (1977) (Burger, C.J., concurring) ("[The attorney], not the client, has the immediate -- and ultimate -- responsibility of deciding if and when to object, which witnesses, if any, to call, and what defenses to develop."). The Sixth Circuit Court of Appeals has concluded that issue selection similarly falls in this category. Meeks v. Bergen, 749 F.2d 322, 328 (6th Cir.

21

1984) (criminal defense counsel may make strategic decision to assert self-defense rather than battered wife syndrome as defense at client's murder trial).  The Eleventh Circuit Court of Appeals has concluded that counsel has the ultimate authority to decide issues concerning "what evidence should be introduced, what stipulations should be made, what objections should be raised, and what pre-trial motions should be filed."  Teague, 953 F.2d at 1531.

Recent decisions of the First and Eleventh Circuit Courts of Appeals recognize the prerogatives of defense counsel with respect to non-fundamental matters in the course of rejecting ineffective assistance of counsel claims.  In Routly v. Singletary, 33 F.2d 1279 (11th Cir. 1994), cert. denied, 115 S. Ct. 2627 (1995), the petitioner in a habeas proceeding maintained that his counsel had provided ineffective assistance of counsel during his homicide trial.  The jury had returned to the courtroom during its deliberations and informed the court that it had been unable to hear the testimony of the state's primary witness.  Petitioner faulted counsel for not moving for a mistrial on the ground that the jury was thus deliberating without the benefit of an important segment of the trial evidence.  The district court rejected the ineffective assistance claim based on the fact that counsel's decision not to move for a mistrial was a "deliberate tactical choice."  33 F.3d at 1289. Counsel decided "not to move for a mistrial precisely because the jury might have difficulty in coming to unanimous agreement

22

concerning the content of the state's most important witness." Id. The court of appeals affirmed. Id. at 1282.

In United States v. McGill, 11 F.3d 223 (1st Cir. 1993), the defendant corrections officer was alleged to have shot and killed an inmate while acting out a "Russian roulette" scene from the motion picture The Deerhunter (Universal Studios 1978). The prosection wished to introduce a fifteen minute excerpt from the film containing the scene allegedly mimicked. Defense counsel, over the strenuous objection of his client, stipulated that the film could be exhibited to the jury in its entirety. The court held that this was not ineffective assistance of his client, observing:

> Based on his judgments concerning relevance, probative value, unfairly prejudicial impact, and how the judge would likely rule, counsel calculated that he would not prevail on a motion to exclude the film clip. In an effort to cut anticipated losses, he obtained a stipulation from the prosecution that the entire three-hour movie would be shown, in the expectation that the impact of the critical scene would be dissipated.
>
> * * * *
>
> To avoid the shoals of ineffective assistance, an attorney's judgment need not necessarily be right, so long as it is reasonable. See Strickland, 466 U.S. at 687–91, 104 S.Ct. at 2064. Here, counsel made an unarguably reasonable choice. In acting on it, he extracted a fair concession for the ensuing stipulation, compelling the prosecution to show the entire film rather than zeroing in on the shorter, more powerful excerpt. And, finally, counsel's decision not to abide by the wishes of his client has no necessary bearing on the question of professional competence; indeed, in some instances, listening to the client rather

23

> than to the dictates of professional judgment
> may itself constitute incompetence.

11 F.3d at 227 (footnote omitted).

The district court in this proceeding concluded that Joseph was required to follow Weatherwax's direct instruction to "do something," such as "file a motion." We disagree. Whether to file a motion in this context was not a "fundamental decision[] regarding the case." Jones, 463 U.S. at 751. Wherever the precise line between client and counsel decision-making should be drawn, this decision fell squarely within the realm of strategy and tactics and thus was a decision for Joseph to make.

Some of the decisions deemed "fundamental" -- such as a decision whether to plead guilty or to take an appeal -- relate directly to the objectives of the representation. Cf. Model Rules of Professional Conduct Rule 1.2(a) (1994) (stating that a lawyer must abide by a client's decisions concerning the objectives of representation). While the accused should receive the full and careful advice of her lawyer before entering a guilty plea or taking an appeal, these decisions ultimately must be made by the defendant herself. The lawyer can inform the client of the likely consequences of those decisions, but only the defendant knows whether she prefers to bear those consequences or prefers to accept the costs and consequences of going to trial or filing an appeal.

Other fundamental decisions, such as whether to forego assistance of counsel, to waive a jury trial, or to testify in one's own behalf, in a sense may be viewed as strategic decisions

24

because they relate to the means employed by the defense to obtain the primary object of the representation -- ordinarily, a favorable end result. Nevertheless, these decisions are so personal and crucial to the accused's fate that they take on an importance equivalent to that of deciding the objectives of the representation. As the Court explained in Faretta, for example, "although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'" 422 U.S. at 834 (quoting Illinois v. Allen, 397 U.S. 337, 350-51 (1970) (Brennan, J., concurring)).

Joseph's decision not to bring the newspaper incident to the court's attention cannot be regarded as fundamental. First, Joseph's decision did not relate directly to the objectives of his representation at that point -- acquittal of first degree murder and the lesser charges. Instead, Joseph's decision concerned only the means employed by the defense to reach that agreed-upon goal. As the commentary to Model Rule of Professional Conduct 1.2(a) states, while a lawyer must abide by a client's decisions concerning the objectives of her representation, a lawyer "is not required to . . . employ means simply because a client may wish that the lawyer do so."

Nor did Joseph usurp Weatherwax's authority to make a fundamental personal decision comparable to decisions on whether to forego assistance of counsel, to waive a jury trial, or to testify in one's own behalf. Instead, Joseph's decision concerned whether he should object once he learned that a

25

distorted newspaper account of the trial testimony may have made its way to the jury. It was clearly an important decision, but it was not one where respect for the individual's autonomy requires us to disregard the desirability of having professional judgment exercised in the client's best interest.

We believe Joseph's decision not to object was analogous to a strategic choice not to object to the admission of inadmissible hearsay evidence tendered by the prosecution. In both situations, the consequence of a failure to object is that the jury will (or in Weatherwax's case might) learn information untested by the adversarial process that it would not otherwise have learned. In both instances, defense counsel has the power to prevent that from happening, but decides that it is strategically advantageous not to make the objection. Contrary to the district court's suggestion, in neither instance is the defendant's right to a jury trial implicated. In both instances the decision is "the exclusive province of the lawyer," ABA Standards § 4-5.2(b), and if, as here, that decision has a rational basis, a court is without authority to second-guess counsel's judgment call.

C.

That Joseph's decision was not a fundamental one and thus fell into "the exclusive province of the lawyer" does not end our inquiry, however. Important strategic and tactical decisions should be made only after a lawyer consults with his client. ABA Standards § 4-5.2(b); Strickland, 466 U.S. at 688

26

(noting counsel's "duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution").

The interchange between Joseph and his client in the courthouse on the last morning of the trial cannot fairly, in our judgment, be described as a failure to consult. Considering the fact that the newspaper incident arose suddenly when counsel was entering the courtroom on the last morning of the trial, this interchange, while brief, was far from perfunctory. Mrs. Lay indicated that it lasted long enough for each of the family members to speak and for Joseph to say "a lot of things during the course of the conversation." (J.A. 67.) Joseph listened to what the client's family had to report and to their views about what should be done. He evaluated that information and expressed his own view of what was in Weatherwax's best interests. Moreover, he explained the reasons behind his view -- that this was the best jury Weatherwax could hope for. Neither Weatherwax nor his family complained at the hearing about Joseph not listening or cutting them off short. Their complaint was that they wanted him to "file a motion" and he did not file one. While this is true, it does not mean that Joseph failed to consult with his client about the decision to be made.

The requirement that counsel consult with his or her client concerning issues on which counsel has the final word serves a number of important purposes. First, it assures that the client will have the opportunity to assist with his own defense. As one court has noted, "[w]hile an attorney's

27

education and experience give him superior knowledge of generalized technical information, '[t]he client possesses superior knowledge of another sort -- knowledge of the facts and circumstances of his case.'" Stano v. Dugger, 921 F.2d 1125, 1146 n.33 (11th Cir.) (second alteration in original) (quoting Mark Spiegel, Lawyering and Client Decisionmaking: Informed Consent and the Legal Profession, 128 U. Pa. L. Rev. 41, 100 (1979)), cert. denied, 502 U.S. 835 (1991); cf. Strickland, 466 U.S. at 691 (noting that counsel's decision not to investigate a matter must be evaluated in light of information that the defendant might have supplied the lawyer). Second, the client's views and desires concerning the best course to be followed are relevant considerations that must be evaluated and taken into account by counsel. Without consultation, the views and desires of the client may not be known to counsel. Third, consultation serves to promote and maintain a cooperative client-counsel relationship. We have carefully reviewed the record in this case and we perceive no threat to the accomplishment of any of these objectives. Weatherwax had an ample opportunity to convey the information available to him and to share his own appraisal of the situation, and nothing about the length or character of the conference would appear to have strained the attorney-client relationship between Joseph and Weatherwax.

Consultation between counsel and client may in some circumstances serve a fourth purpose. If the client learns from a consultation that counsel is going to pursue a strategy contrary to the client's wish and the matter is important enough

28

to the client to forego the benefits of his current representation, the consultation may afford the client an opportunity to seek different representation. Given that Joseph was found to have given some assurance that he would "file a motion" and not to have communicated his final decision to Weatherwax, this fourth purpose requires further discussion.

The constitutional duty to consult regarding issues on which counsel has the last word requires only that counsel act reasonably in light of the circumstances and what is likely to be accomplished by a consultation. When decisions must be made in the heat of battle at trial, for example, it will often be unreasonable to expect any consultation before the decision is made and implemented, either because the opportunity for meaningful consultation does not exist or because there is little if anything to be gained by consultation.

Even where there is an opportunity for consultation, counsel may reasonably elect not to communicate his final decision when counsel and client have previously exchanged their views on the issue and the alternative of changing representation is not a realistic one. In many trial situations, the nature or importance of the issue over which a client-counsel disagreement occurs cannot be expected to cause the client seriously to consider foregoing the advantages of the current representation. In other situations, consideration of a change in representation would be pointless because the court would not permit it at that stage in the proceedings.

Here, Weatherwax did not contend, and the district court did not find, that Weatherwax would have sought to change representation had he been advised of Joseph's final decision on the newspaper issue. Nor did Weatherwax contend, or the district court find, that Joseph should have anticipated that the district court might permit a continuance and change of representation on the last day of Weatherwax's jury trial. Indeed, Weatherwax did not argue, and the district court did not find, that there was an opportunity for meaningful consultation with Weatherwax after Joseph made his decision not to pursue the newspaper issue.

We cannot say on the basis of this record that Joseph acted unreasonably under all the circumstances in failing to tell Weatherwax, prior to the jury's verdict,[0] of his ultimate decision on the newspaper issue.[0] Joseph had rebuttal witnesses

---

[0] Nothing, of course, foreclosed Weatherwax from pursuing the newspaper issue after the verdict, by himself or through other counsel, as he ultimately did in this proceeding.

[0] The district court did not find that Joseph made his final decision on the newspaper issue during the courtroom conference and thus that Joseph was deliberately misleading his client when he said he would "do something." Accordingly, we decline to assume that this was the case. If such deception had occurred, however, there would appear to be no causal nexus between that deception and the alleged problem here -- the resolution of Weatherwax's case by a jury that may have been exposed to a distorted newspaper account of the trial testimony. Whether Joseph made his final decision before or after the conclusion of the conference, the district court was not at liberty to overturn Weatherwax's conviction without making a finding, based on record evidence, that without Joseph's assurances about filing a motion, an objection would have been raised and the course of events altered. This is not to say that Weatherwax had the burden of showing that the newspaper article adversely affected the jury. We do say, however, that habeas corpus relief on the basis of Joseph's assurances would have been inappropriate where there was no reason to believe a different jury would have decided Weatherwax's case in the absence of those assurances.

to cross-examine, a jury instruction conference to attend, and a summation to deliver. Even assuming there was a fair opportunity to consult further with Weatherwax, however, we do not believe Joseph could reasonably be expected to have anticipated that anything would be accomplished by taking that course. On the contrary, given the circumstances disclosed in the record, we believe that reasonable counsel in Joseph's position would not have believed either that Weatherwax would seriously consider a change in representation or that, if he did, the court would have permitted a change in representation at that stage of the proceedings. Not only would an extended continuance have been a burden on the jury, the trial court would have no assurance that new counsel would not insist on the same strategy upon which Joseph was insisting.

In short, after discussing the pros and cons of a tactical decision with his client, Joseph made a reasonable choice that was his to make. His failure to advise his client of that decision cannot be said to be unreasonable, and Weatherwax has thus failed to carry his burden of overcoming the presumption of constitutionally acceptable performance.

IV.

The district court also reasoned that Joseph's decision not to bring the newspaper incident to the court's attention was a "breach of his duty as an officer of the court." (Dist. Ct. Op. at 16.) Joseph's duty to the trial court, in the district court's view, followed both from counsel's "duty to bring to bear

31

such skill and knowledge as will render the trial a reliable adversarial testing process," <u>Strickland</u>, 466 U.S. at 688, and from the trial judge's repeated admonitions that the jury should avoid reading articles about the trial.

We express no opinion on whether <u>Strickland</u> or the trial court's repeated admonitions support the district court's theory that Joseph's duty as an officer of the court required him to bring the matter to the court's attention.[0] As we have explained, Joseph acted as he did solely for the purpose of serving what he believed to be the best interests of his client and in a manner consistent with his other obligations to his client. Given this fact, even if Joseph had some duty to the court to inform it of the possibility of jury misconduct, we perceive no reason why the breach of that duty should require the reversal of Weatherwax's conviction. If counsel breaches a duty <u>to the court</u>, this does not necessarily mean that the representation of <u>his client</u> was ineffective. Assuming that Joseph did violate some ethical duty to the court that would warrant disciplinary sanctions <u>against him</u>, that breach would provide no justification for a remedy that would, in effect, impose a sanction <u>upon the government</u>. Indeed, we believe that

[0] The Weatherwax family did not report to Joseph a violation of the court's order that jurors refrain from reading articles about the case. Joseph's view that there likely had been no violation of that order was not unreasonable. Moreover, the investigation necessary to determine whether there had been a violation could not be conducted without court approval and seeking such approval was, in Joseph's professional judgment, inconsistent with his duty of loyalty to his client. The issue of whether Joseph had an ethical duty to the court to report the newspaper incident is, accordingly, a debatable one.

32

overturning a conviction in a situation of this kind on the basis of counsel's breach of an ethical duty to the court would create a perverse incentive for defense counsel to "build in" reversible error for their clients by violating their duties as officers of the court.

We accordingly hold that any breach of Joseph's duty to the court would not support the judgment of the district court.

V.

For the foregoing reasons, the district court's judgment directing Weatherwax's retrial or release will be reversed and this case will be remanded with instructions that his petition for habeas relief be denied.

Government of the Virgin Islands v. William Weatherwax
No. 95-7126


LEWIS, Circuit Judge, dissenting.

A naive assumption about race served as the sole basis for Joseph's "stra[tegic] decision" to ignore the wishes of his client regarding the newspaper incident. I [not] believe that the decision was unreasonable under prevailing professional norms; I a[lso] believe that it was based upon an underlying assumption that was explicitly rejecte[d as] unreasonable by the Supreme Court in Batson v. Kentucky, 476 U.S. 79 (1986) (reject[ing] notion that it is reasonable to assume that black jurors will be partial to black defendants solely on account of their shared race). See Batson, 476 U.S. at 97. Accordingly, I dissent.[0]

Although the majority acknowledges the "racially charged" nature of this [case, I] do not believe it adequately pursues the extent to which race influenced Joseph's [decision] not to inform the court about the juror seen carrying a newspaper into the jury roo[m,] which included an inaccurate and unfavorable article about his client's testimony. [In my] view, in order to assess fairly whether Joseph's strategic choice was reasonable, w[e must] candidly address the assumptions that influenced his decision.

I.

---

[0] This case does not require us to decide the broader and admittedly more diffi[cult] question of the reasonableness or legitimacy of trial strategies that are designed [to] appeal to the particular racial make-up of a jury. Rather, the views I express rel[ate] specifically to the issue of whether a strategic decision, grounded exclusively upo[n a] lawyer's assumptions about the proclivities of jurors based solely upon their race, [can be] considered professionally reasonable when that decision runs counter to the express[ wishes] of his or her client and increases the likelihood that that client's constitutional [right] to an impartial jury will be violated.

2

In determining whether Joseph's actions constituted a sound trial strateg[y] majority places great emphasis upon the fact that his decision stemmed from a belie[f] the "jury was the best that could be expected from Weatherwax's point of view." (Ma[j. Op.] at 16). In light of this, the majority concludes, "the [strategic] decision not to [alert] the court was reasonable `under prevailing professional norms.'"[0] (Maj. Op. at 16). [In] other words, Joseph thought that "he had the best jury possible under the circumsta[nces] and he made a judgment that many competent litigators would make under the same circumstances." (Maj. Op. at 16). Respectfully, I believe my colleagues' focus is [both] legally and logically misplaced.

Arguably, most if not all decisions by counsel before, during and after a [trial] can be considered strategic. As a result, a finding that a particular decision was strategic, in and of itself, cannot answer the question whether that decision falls [within] the "wide range of . . . competent assistance." See Strickland v. Washington, 466 [U.S.] 668, 694 (1984). Put differently, not all strategic decisions are by definition professionally reasonable.[0] In order to determine whether a particular strategic d[ecision]

---

[0] According to the majority, "[b]ringing the newspaper incident to the court's [attention would have created a likelihood that the court would either declare a mis[trial] or excuse a juror whom Joseph felt favored the defense." (Maj. Op. at 16). A mist[rial or] the dismissal of a juror, however, would necessarily have required a finding that: [(1) that] the newspaper article was read by one or more jurors; (2) that its contents were prejudicial to Weatherwax; and (3) that a juror who read the article was actually influenced by its prejudicial nature. See Government of the Virgin Islands v. Weath[erwax,] 20 F.3d 572 (3d Cir. 1994) (discussing Government of the Virgin Islands v. Dowling, [814] F.2d 134 (3d Cir. 1987)). If the court were to have found that a particular juror [--] presumably the white member of the jury seen carrying the newspaper -- should be di[smissed] (i.e., that he was actually prejudiced by reading the article), then it is totally illogical to argue that Weatherwax would still have benefitted from the presence of [that] juror simply because the juror was white.

[0] In Government of Virgin Islands v. Weatherwax, 20 F.3d 572, 579 (3d Cir. 1994[), our] first review of this case, we observed that "trial counsel's actions here would inc[lude]

3

constituted "competent assistance," we must assess the underlying basis for that de

-- an inquiry that, in my view, is not sufficiently pursued by the majority.  Mored

because the majority does not fully confront why Joseph felt that this was the best

possible jury from Weatherwax's perspective, its conclusion that Joseph's inaction

"reasonable `under prevailing professional norms'" strikes me as quite a leap, to s

least.

The following hypothetical, I think, will help to illustrate my point.

Suppose that John Doe, a black man, is charged with first degree murder f

shooting a white man, but claims that the killing was in self-defense.  Furthermore

suppose that Doe's jury is all white.  During the course of the trial Doe's attorne

decides not to call to the stand a black man, who was a witness to the crime, despi

Doe's request that the testimony be heard.

On appeal, Doe brings an ineffective assistance of counsel claim in which

alleges that his lawyer was incompetent based upon his decision not to introduce th

eyewitness testimony of the black man, whom Doe felt potentially could have aided i

defense.  In response to this charge, Doe's lawyer claims that he chose not to call

individual as a witness because he made a professional judgment and concluded that

witness's testimony would have had no impact upon the jury.

that representation was deficient unless the district court determines he [Joseph]
to forego voir dire because he thought the jury was favorable to his client."  I wa
member of the panel which decided that case, and I adhere to this statement insofar
is premised upon the notion that strategic decisions by counsel, including those ba
upon a lawyer's belief that a jury is favorable to his client, are presumptively
reasonable.  In this case, however, the record developed on remand clearly demonstr
that Joseph's reliance upon the favorable make-up of the jury as an explanation for
inaction was unreasonable because it was motivated solely by an illegitimate race-b
stereotype.

4

Under the majority's logic, the lawyer's explanation that the witness was called because the testimony would have been ineffectual would, standing alone, con a sufficient basis upon which to conclude that Doe's counsel acted "reasonably `und prevailing professional norms.'" (See Maj. Op. at 18 (favorably citing United Stat Long, 674 F.2d 848, 855 (11th Cir. 1982) (holding that counsel's failure to call a witness was not ineffective assistance and stating: "This Court will not-second gu tactical decisions of counsel in deciding whether to call certain witnesses."))). other words, the majority would not find it necessary to question why Doe's counsel that the eyewitness's testimony was not worth introducing.

Suppose, however, that the answer to the question the majority does not a that Doe's attorney made his decision not because he believed that the witness or h story would be incredible, but because he felt strongly that the testimony of a bla person would simply carry no weight in the minds of an all-white jury because the w was white. Surely, the majority would not conclude that Doe's counsel employed a reasonable strategy by allowing this type of outmoded racial stereotyping to influe decision whether or not to call the witness. To countenance such an approach, unde guise of "strategic decisionmaking," would be to place a judicial imprimatur upon t of evil that Batson and its progeny sought to bury. I have no doubt that under su circumstances, we would not permit either a criminal defendant or our system of jus risk being sacrificed to an odious form of racial reasoning disguised as a legitima strategic judgment.

5

And yet, a close examination of the record in this case reveals that the

underlying <u>why</u> Joseph decided not to bring the newspaper incident to the court's at

is very similar to that of Doe's attorney.

For example, in arguing to the district court that Joseph's decision was

reasonable and did not require a new trial, the attorney for the government stated

> As unlikable as it may be, we all have prejudices and prejudices
> may play at trials and Attorney Joseph, based upon his education and
> training but more his experience, told you that, typically speaking, I
> don't like Continentals on my juries . . .
>
> In this case I can say I guess fairly that Michael Joseph cut
> against the grain. He didn't do the same old thing this time. He was
> insightful. He said I have a different defendant with a different
> profile. . . . Three Continentals on this jury? I don't want to
> disturb this jury. I want to leave it the way it is. It was a
> tactical decision. He tried to get that jury. He accomplished the
> fact of getting that jury and once it was empaneled, he didn't want to
> disturb it.
>
> . . .
>
> He said . . . I wanted to keep this jury because I knew with
> three Continentals on there that he had a better chance.

(JA 84). Moreover, the "Proposed Findings of Fact and Conclusions of Law," submitt

the government to the trial court, stated:

> Because the petitioner is Caucasian, and because he had been charged
> with killing a black man, Joseph decided that it was important to
> empanel as many Caucasians people on the jury as possible because <u>he</u>
> <u>believed that Caucasians would identify with the petitioner</u>. Given
> the nature of the charge, first degree murder, the Court finds that
> Joseph's strategy, in that regard, was eminently reasonable.

(JA 98) (emphasis added).

Simply put, Joseph disregarded his client's request that he "do something

the newspaper incident because he felt that the three white jurors, solely because

6

were white, would sympathize with Weatherwax.  In fact, Joseph's judgment was entir

motivated by race.  For example, he stated that "Continentals [i.e. white people] a

often retirees who are viewed as conservative and anti-crime."  (See Appellant's Br

n.4.)  This admission reveals that there was no reason whatsoever for Joseph to cor

that the three white jurors would identify with Weatherwax other than their shared

Why else would persons who are "conservative and anti-crime" identify with an indiv

charged with first degree murder and illegal possession of a firearm?

Joseph's troubling assumptions about the racial partisanship of the white

were so deep-seated that he was willing to risk allowing a white juror, who could h

been prejudiced by an unfavorable article written about his client's testimony, to

on the jury.[0]  In Joseph's testimony before the district court, he went so far as t

"even if I was [sic] told that the jury was reading the paper, it would not have ma

difference to me."  See Judge Brotman's Memorandum Opinion at 4.  In my opinion, to

extent such unfortunate assumptions might ever be considered reasonable, they simpl

cannot form the basis of a professionally reasonable strategic decision in light of

interests that weighed in favor of bringing the matter to the court's attention.

On one side of the scale was Joseph's assumption that the white jurors wo

sympathize with Weatherwax based only on their shared race, an approach which,

predictably, backfired and which the Supreme Court explicitly rejected as unreasona

Batson.  On the merits, this assumption is undeserving of any weight, but if one we

pretend that it should carry any, one might conclude that it weighed in favor of no

---

[0]	During the hearing before the district court, Mrs. Lay testified that Joseph

that the jury [sic] with the newspaper is a white man."  (J.A. at 68).

7

informing the court about the newspaper incident.[0]  But on the other side of the sc

were two legitimate and important considerations: (1) Weatherwax's explicit request

Joseph "do something" about the newspaper incident; and (2) the potential that a fa

to do so could jeopardize Weatherwax's constitutional right to an impartial jury.

balanced against one another the only professionally responsible and reasonable cho

Joseph was to inform the trial court of what had occurred.[0]

---

[0]    As stated earlier, the unreasonableness of Joseph's assumption is demonstrated
fact that he was willing to risk allowing white jurors, who may have been prejudice
against his client by reading an unfavorable article about his client's testimony,
remain on the jury simply based upon their race. In my opinion, such a judgment is
professionally indefensible.

In the majority's view, however, the underlying basis for Joseph's decision fi
support in a variety of social science research, which tends to show that jurors ar
fact partial to defendants of the same race.  I do not dispute the legitimacy or ac
of these studies or theories.  Rather, I simply believe that it is unreasonable to
that these "affinities" are so deep-seated that they would justify the risk of allo
potentially biased or prejudiced juror to remain on the jury solely due to his or h
race.  For example, if Joseph had discovered that one of the white jurors was marri
relative of the crime victim, I am confident that the majority would not consider i
reasonable for Joseph to want to keep that white juror on the case simply because o
or her race.  Thus, it seems clear to me that concerns over juror prejudice --parti
when raised by a client -- must trump assumptions about the racial partisanship of

[0]    Even if I could conceive of a convincing argument that Joseph's decision cons
a reasonable strategy, which I cannot, I would still conclude that his actions fell
professional norms.  Rather than completely ignore his client's wishes, the more
appropriate action for Joseph would have been to bring the matter to the attention
court, and then to ask the court not to poll the jury because of its "favorable" ma

The majority contends that "had Joseph brought the newspaper incident to the
court's attention, the court would have had an affirmative obligation to conduct vo
. . . ." See Government of the Virgin Islands v. Dowling, 814 F.2d 134, 139 (3d Ci
1987) ("In every case where the trial court learns that a member or members of the
may have received extra-record information with a potential for substantial prejudi
trial court must determine whether the members of the jury have been prejudiced.")
(emphasis added) (Maj. Op. at 16-17 n.3).  I disagree.  As the majority itself note
"[t]he [newspaper] article . . . included no extra-record information about Weather
the crime."  (Maj. Op. at 3 n.1) (emphasis added).  Accordingly, I believe that by

8

Because Joseph's decision was motivated by improper, illegitimate, indefe[...] outmoded stereotypical assumptions about the proclivities of whites and blacks whe[...] are called upon to sit in judgment of their fellow citizens, and because his decisi[...] far outside "the wide range of professionally competent assistance," to which Weath[...] was entitled, I would affirm the district court's order. Accordingly, I dissent.

---

bringing the matter to the court's attention, Joseph would have accommodated the re[...] of his client, while simultaneously protecting his trial strategy. Moreover, altho[...] less desirable, once Weatherwax was found guilty of second-degree murder, this cour[...] action would have enabled Joseph to file a motion for a new trial based on the news[...] incident. <u>See</u> Fed. R. Crim. Proc. 33.

9