# GOVERNMENT OF THE VIRGIN ISLANDS

## v.

## WILLIAM WEATHERWAX, Appellant

No. 93-7182

United States Court of Appeals

for the Third Circuit

March 31, 1994

WILLIAM WEATHERWAX, El Reno, OK, *for appellant*

TERRY M. HALPERN, ESQ., United States Attorney, CARL MOREY, ESQ., Office of the United States Attorney, Christiansted, St. Croix, V.I., *for appellee*

BEFORE: MANSMANN, HUTCHINSON and LEWIS, *Circuit Judges*

## OPINION OF THE COURT

MANSMANN, *Circuit Judge*

William Weatherwax appeals from an order dismissing, without an evidentiary hearing, his petition for writ of habeas corpus filed

pursuant to 28 U.S.C. § 2254. In this petition Weatherwax alleged that both his trial and appellate counsel failed to provide him with effective representation. We center on the claim that trial counsel failed to request a voir dire to determine the impact on the jury when one of its members brought a newspaper article concerning Weatherwax's trial into the juryroom.

Because this allegation, if proven, would constitute grounds for habeas relief, assuming counsel did not have a strategic reason for failing to request voir dire, we will vacate the order dismissing the writ and remand the matter to the district court to conduct an evidentiary hearing on this issue. Our jurisdiction is pursuant to 28 U.S.C. § 1291.

I.

William Weatherwax was convicted by a jury of second degree murder in the shooting of St. Clair Hazel. At trial, Weatherwax did not deny shooting Hazel but claimed he acted in self-defense and that his weapon discharged accidentally. Weatherwax received a sentence of 25 years on the second degree murder charge and five years for unlawful possession of a weapon. We affirmed the district court's judgment of conviction. Government of the Virgin Islands v. Weatherwax, No. 89-3332, mem. op. at 9 (3d Cir. Dec. 22, 1989).

On March 21, 1992, Weatherwax filed a petition for writ of habeas corpus, alleging ineffective assistance of both his trial and appellate counsel, identifying five instances where trial counsel failed to effectively aid his defense.[1] Regarding representation on appeal,

---

[1] Weatherwax contended that: (1) counsel failed to counter the government's attack on Weatherwax's son's reputation for truthfulness; (2) counsel did not secure Hazel's FBI record as evidence of the victim's reputation for violence; (3) counsel did not notify the court that a juror carried a newspaper article concerning the trial into the jury room; (4) counsel mishandled a note from the jury identifying inappropriate conduct of the court clerk; and, (5) counsel did not object to certain instances of alleged prosecutorial misconduct.

Without conducting an evidentiary hearing, the district court found that: (1) trial counsel's non-response to the issue of Weatherwax's son's reputation for truthfulness was a defensible tactical decision as there was evidence which called the boy's veracity into question; (2) the absence of evidence that Weatherwax was aware of the content of the victim's FBI record at the time of the shooting precluded its use as evidence of Hazel's reputation for violence; (3) the presence of the newspaper article in the jury room, without evidence of juror prejudice, did not taint the fundamental fairness of the trial; (4) the trial

412

Weatherwax's chief complaint was that the appointed counsel was ineffective because he failed to obtain a transcript of the prosecutor's closing remarks, which in turn precluded him from effectively arguing the appeal's merits.[2]

It is an allegation of juror misconduct—the introduction of a newspaper article concerning the trial proceedings into the jury-room—which commands our attention. We must decide if trial counsel's failure to notify the court of this incident and to request a jury voir dire to determine if prejudice resulted equates to ineffective representation.

■ The question of whether inadequate performance by counsel necessitates habeas relief involves a multi-step inquiry. As in any case where the writ is denied without a hearing, we must first determine whether Weatherwax has alleged facts, viewed in the light most favorable to him, that, if proven, would entitle him to relief. "If so, we must then decide if an evidentiary hearing is necessary to establish the truth of [the petitioner's] allegations." Zettlemoyer v. Fulcomer, 923 F.2d 284, 291 (3d Cir. 1991).

■ When ineffectiveness of counsel is the alleged basis for habeas relief, our analysis is further guided by United States v. Daw-

---

court's curative instruction to the jury, cautioning it to disregard the body language of the court clerk, was an appropriate response which did not require objection by counsel; and, (5) the trial court's instruction to the jury concerning both the content and the proper construction of remarks of counsel did not justify reversal of the conviction. Thus, the court concluded that Weatherwax had not sustained his burden of establishing that his Sixth Amendment right to effective trial counsel had been violated.

[2] The district court concluded generally that appellate counsel's performance did not fall below the reasonableness standard announced by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). Relevant to this appeal, the court determined that appellate counsel's failure to request transcripts of the closing argument was not deficient since the court stenographer attested that these notes had been lost. The court observed that when the transcripts are missing, Fed. R. App. P. 10(c) requires that the petitioner produce a statement evidencing the missing portion for the record. The court also cited the petitioner's lack of reference to any specific instance of prejudice emanating from the closing arguments.

The government asserts that some of the allegations of ineffectiveness detailed in Weatherwax's appeal were raised in the first instance before us. We note too that Weatherwax himself has chosen not to pursue several of his asserted claims of appellate counsel's ineffectiveness. Because none of these instances are dispositive, we need not address the issue of their preservation.

son, 857 F.2d 923 (3d Cir. 1988). Under Dawson, we examine the existing record to determine whether all non-frivolous claims, accepted as true, "conclusively fail[ed] to show ineffective assistance of counsel." Id. at 927–28. Counsel's effectiveness is determined by the Strickland v. Washington, 466 U.S. 688 (1984), standard: whether counsel's performance was so deficient that errors made were of a magnitude that the guarantees of the Sixth Amendment were not satisfied and the defendant was deprived of a fair trial. Id. at 687. We review the facts alleged by Weatherwax regarding the juror misconduct with these standards in mind.

## II.

On day three of Weatherwax's trial, a banner headline on page 3 of the local newspaper, the St. Croix Avis, announced the following: "WEATHERWAX: I COCKED HAMMER AND TOOK AIM." This headline purported to highlight Weatherwax's testimony from the previous day of the trial. The article following the headline first detailed the prosecutor's dramatic display of a handgun, then reported the follow-up questioning as follows:

> [The prosecutor] then took the gun, held it in the air and fired into an empty chamber, asking Weatherwax if that was the way he had fired it.
>
> Weatherwax replied, "Not that night. *I cocked the hammer and took aim.*"
>
> "When did you cock it?" [The prosecutor] asked.
>
> "When he started coming at me with the rocks."
>
> "What was the purpose of cocking the hammer?" was [the prosecutor's] next question.
>
> "To get the gun ready to fire" Weatherwax replied.
>
> [The prosecutor's] next question was, "You didn't cock the hammer by accident did you?"
>
> Weatherwax replied, "I pointed the gun right at him . . . I pulled the gun overhead . . . the gun just went off . . . Things just happened so fast . . . It was . . . Just a minute . . . what are you getting at?"

Charles Fisher, *Weatherwax: I Cocked Hammer And Took Aim*, St. Croix Avis, March 9, 1989, at 3, 11 (emphasis added).

## A.

In considering the impact of the newspaper story, the district court observed that a court would reverse the conviction or grant

414

Weatherwax a new trial only if there was "'a reasonable probability' that the cited material in the article would affect the verdict, and each case is fact specific." Government of Virgin Islands v. Weatherwax, Crim. No. 88-139, mem. op. at 5 (D.V.I. Feb. 22, 1993), citing United States v. Herrerro, 893 F.2d 1512 (7th Cir. 1990). The court then characterized the newspaper article as "a verbatim and dispassionate account of the testimony adduced at trial," and as so classified, its reading by the jury could not be prejudicial. The court concluded that trial counsel's decision not to pursue the issue was a tactical one insufficient to support an ineffectiveness claim.

We disagree. Indeed, the actual trial testimony which the article professes to describe, quoted verbatim, varies from the published account in several significant respects. During the prosecutor's cross-examination of Weatherwax, the following exchange occurred:

[Nissman] Q. I want you to watch me pull this trigger and I want you to tell me if your gun fired about the same way?

[Weatherwax] A. Not that night.

Q. Regularly, you said not that night. Is that how the gun regularly fired?

A. Yes.

Q. And have you shot this gun before.

A. Um hum.

Q. And you would have to pull the trigger back—

A. No, I didn't usually fire like that.

Q. *How did you usually fire?*

A. *I cock the hammer, and took aim and—*

Q. So you were firing what's called single action bullet, you pull that back like that—

A. Um hum.

Q.—and then you fire it? And what did you do that night?

A. Well, that's how I—that's how it happened. I had the hammer cocked back.

Q. Well, could you tell us when you cocked the hammer back?

A. When he kept coming at me with the rock.

Q. Well, I don't remember—you didn't tell us that on direct examination; did you?

415

A. I don't understand what you're asking.

Q. Well, you indicated on direct examination that he kept coming to you, you pointed the gun at him, closed your eyes and it went off. Isn't that what you said on direct examination?

A. Something like that.

Q. All right. Now, when I asked you—

A. I don't think I did tell you that I cocked the hammer.

Q. You remember cocking that hammer back now; don't you?

A. Yes.

Q. And when you cocked that hammer back, what was the purpose of cocking the hammer back?

A. What was the purpose of cocking the hammer back?

Q. Yes. What was the purpose of cocking the hammer back?

A. To get the gun ready to fire.

Q. So at that point you did make a conscious decision that you were going to fire the weapon?

A. No.

Q. Then why did you do it?

A. I was getting ready. It was either him or me.

Q. All right. Now, let's be fair about this. When you cocked that hammer back—

MR. JOSEPH: I object to the characterization, "let's be fair about this."

MR. NISSMAN: I'll strike that.

BY MR. NISSMAN:

Q. When you cocked that hammer back, and you had that gun pointed at him, you didn't cock the hammer back by accident; did you?

A. No, I didn't.

Q. And you recall your testimony was that—and correct me if I'm wrong—but you said words to this effect on direct examination. "I pointed the gun right at him. He started to hit me with the rock. I pulled the gun overhead, over his head. The gun just went off."

A. I don't remember if that's exactly what I said.

416

Q. *Well, what I want to know is that you said you pointed the gun right at him. While you were pointing the gun right at him, is that when you cocked the hammer back?*

A. *No, I ah—I ah—I think I cocked the hammer back before pointing the weapon at him.*

Q. So, then it would have been when you showed him the weapon you cocked the hammer back?

A. It think it was—this happened so fast it was *just a movement.* Well, what are you trying to get at?

Q. Well, I'm trying to reconstruct what you just reconstructed to the jury. You showed us a movement where you pulled the gun out of your pants and you showed him the weapon. And you indicated that that was prior to the time that you pointed it at him. And then you demonstrated that you pointed it at him with two hands.

A. Yes.

Q. Are you right hand or left handed?

A. Right handed.

Q. All right. So when you pulled the gun out of your pants, was this with your right hand?

A. Yes.

Q. And you pulled it out with your right hand, you showed him the weapon. Are you now telling us that you cocked the hammer back at the point that you showed him the weapon?

A. It could of been either when I showed him the weapon, or when I raised it, or when I pointed the weapon at him.

Q. But it was at least by the time that you were pointing at him that you had the hammer back; is that correct?

A. Yes.

Trial Transcript at 230–234.

## B.

We first note the discrepancies between the text of the article and the actual testimony. A reader of the article would reasonably conclude that Weatherwax had testified that, on the night of the shooting, he cocked the hammer and aimed the gun at Hazel as he walked toward Weatherwax. The last sentence quoted from Weatherwax's testimony conveys the impression that Weatherwax be-

came confused, stopped his narrative, and questioned the import of the prosecution's question.

A careful dissection of the article, however, demonstrates how this account skewed both the content and the chronology of the actual testimony. The headline quoted Weatherwax as stating, "I COCKED HAMMER AND TOOK AIM," and reiterated that sentence in the body of the article. In fact, Weatherwax never made that statement. Instead, Weatherwax testified that he did not handle the weapon on the night of the shooting in his customary manner, and when asked by the prosecutor how he usually fired the weapon, Weatherwax replied, "I cock the hammer and took aim." The newspaper's misuse of the tense of the word "cock" greatly distorted the import of that sentence. Weatherwax did not testify that on the night of the shooting he made simultaneous movements of cocking the gun and taking aim; the sentence instead described his *prior* handling of the gun. He did testify that he cocked the gun and that he pointed the weapon at St. Clair Hazel, but he never clearly spoke to the succession of these events.

Another gross error in the newspaper's report occurred in its description of a subsequent exchange between the prosecutor and Weatherwax. When the prosecutor asked Weatherwax "You didn't cock the hammer by accident, did you?", the newspaper represented that Weatherwax replied, "I pointed the gun right at him . . . ." In fact, that was not Weatherwax's answer to that question; rather it was an excerpt from Weatherwax's direct examination narrative as to the events of the evening and did not arise in the context of cocking the hammer. *Compare* Trial Transcript at 206 *with* Trial Transcript at 232.

Finally, Weatherwax simply never said as reported: "things happened so fast . . . it was . . . just a minute what are you getting at?" Replying to his reaction to the victim's actions, Weatherwax responded: "This happened so fast—it was just a movement. Well, what are you trying to get at?"

In another category, we note that the article also erroneously structured the order of the questioning. Unquoted questions and answers occurring between questions and answers as reported reduced the directness of Weatherwax's recollection as to the events of that evening.

418

## C.

■ While the wording between the article and the actual testimony may not be dramatically different, the substance of the newspaper article had the overall effect of creating a significantly different version of Weatherwax's testimony. The similarity, however, and not the difference, is what makes the article so potentially damaging. If this newspaper had been brought into the juryroom and had been read by the jurors, we are concerned that its content was so close to the actual testimony that the jurors may not have recognized the distinction. The newspaper article was slanted in favor of the prosecution by portraying Weatherwax as stating that, on the night in question, he readied his gun, aimed at the victim and shot him. In fact, Weatherwax testified that, although he did at some point cock the hammer and did point the gun, these were not simultaneous movements. Although subtle, this difference argues against second degree murder and supports Weatherwax's self-defense testimony.

## III.

Having determined the inaccurate and decidedly unfavorable cast of the article, we must explore the particular facts of this jury's alleged exposure to the article.

Critical points are whether Weatherwax has shown that the article was brought into the juryroom and whether trial counsel was cognizant of this incident. Weatherwax attached several affidavits to his habeas petition to support this. According to the affidavit of courtroom observer Sallie W. Lay, one of the jurors walked out of the juryroom holding a newspaper in his hand. He then walked into the jury box of the courtroom holding the newspaper. Ms. Lay called this behavior to the attention of the U.S. Marshal, who did not secure the newspaper or question the juror, and also to the attention of the defense attorney, who represented that he would take some action the next day. He told Lay not to be concerned because the juror was "the foreman of the jury, on our side, not to bring any attention to it. It would only hurt Billy's case." According to Ms. Lay's affidavit, Mr. Joseph never filed a motion concerning the newspaper.

Another observer of the trial, Danny Ray Leonard, witnessed a juror coming from the juryroom and going into the courtroom with

a newspaper under his arm. In his affidavit, Leonard stated that the newspaper was the same issue containing the story of Weatherwax's trial. Leonard also brought the juror activity to the attention of the defense attorney, who responded that he would file a motion for mistrial on the next day.

The government did not offer contrary evidence on whether the newspaper article was brought into the juryroom by a juror or that trial counsel was aware of this. For purposes of determining whether Weatherwax is entitled to habeas relief, we, therefore, must consider these allegations as true.

## IV.

At this juncture of our review, having commented on the distorted nature of the article, the assumed fact of its entry into the juryroom and counsel's awareness, we are, nonetheless, unable to evaluate the critical "prejudice" aspect. While juror exposure to adverse publicity does not necessarily compromise the fairness of the trial, see Murphy v. Florida, 421 U.S. 794, 799 (1974); see also United States v. Console, Nos. 92-5507, 92-5511, 92-5555, 1993 U.S. App. LEXIS 33361 at * 73 (3d Cir. Dec. 27, 1993), citing United States v. Gilsenan, 949 F.2d 90, 97 (3d Cir. 1991), the likelihood of prejudice cannot be directly measured here because counsel failed to request a jury voir dire.

We have emphasized the importance of questioning jurors whenever the integrity of their deliberations is jeopardized. We recently held that a district court's failure to evaluate the nature of the jury misconduct or the existence of prejudice required a new trial. United States v. Resko, 3 F.3d 684 (3d Cir. 1993). In Resko a two-part written questionnaire submitted to the jurors inquired whether the jurors had engaged in premature deliberations and, if so, whether the discussions had led them to form an opinion regarding the defendant's guilt. Because the questions were not phrased to ascertain significant information about the content or extent of the jurors' discussion, we held that the district court could not have made a reasoned determination that the defendants would not suffer any prejudice due to the jurors' discussions. Id. at 690. Under these circumstances, i.e., where the juror misconduct was discovered mid-trial but the district court did not adequately determine whether defendants were or were not prejudiced, vacation of the convictions and remand for a new trial were necessary. Id. at 695.

See also Waldorf v. Shuta, 3 F.3d 703 (3d Cir. 1993) (because trial court did not conduct adequate voir dire and we cannot know what the outcome of searching inquiry based on objective criteria would have been, civil matter must be remanded for new trial).

In our decisions in Resko and Waldorf we found support in Government of the Virgin Islands v. Dowling, 814 F.2d 134 (3d Cir. 1987). In Dowling, during the defendant's second trial on charges of bank robbery, the trial judge received a note from a juror that indicated that the jury had been exposed to extra-record information both about the facts of the case and about Dowling's past criminal record, which included a prior conviction for bank robbery. The judge then addressed the members of the jury as a group and asked each to raise a card if they had been exposed to any information that had rendered them incapable of deliberating fairly. When no one affirmatively responded to its inquiry, the trial court denied the defendant's motion for a mistrial. On appeal, Dowling asserted that his right to a fair trial was violated by the trial court's failure to conduct a thorough and individual examination of each juror. In addition, Dowling contended that the district court committed plain error when it failed to ascertain the content of the jury's exposure; the district court thus made an uninformed judgment about whether the juror could judge Dowling impartially on the basis of the record evidence alone. Although we found that the trial court did not abuse its discretion in declining to question the jurors individually, we held that the court committed reversible error in failing to conduct a voir dire of the jury that would have permitted the court to evaluate the potential prejudice to the defendant. Id. at 138.

In a similar matter, United States ex rel. Greene v. New Jersey, 519 F.2d 1356 (3d Cir. 1974), the district court held that a state prisoner's right to an impartial jury was abridged by a state trial judge's ruling that a newspaper article did not influence jury deliberation. There, mid-trial newspaper articles described the defendant's attempt to plead non vult to a New Jersey murder indictment. Although Greene was defending on the grounds of temporary insanity, the trial court, without benefit of a voir dire, had denied the defendant's mistrial motion based upon the assumption that the jurors had read the article. The district court granted the writ based upon the strong likelihood that the article was read and that its content was undoubtedly prejudicial. Id. at 1357. We affirmed,

opining that "[i]n light of widespread dissemination of prejudicial information, at the very least, the state court should have conducted an immediate voir dire to determine if the jurors had read the offensive articles." Id. at 1357.

The skewed and unfavorable recital of Weatherwax's testimony is the sort of information that carries the potential for prejudice. We are also presented with uncontradicted evidence that the newspaper was present in the juryroom. Without the benefit of jury voir dire, however, we are unable to ascertain the impact of the article. We have held, however, that proof of actual prejudice is not required. See Resko, at 695.

We thus conclude that the district court erred in denying Weatherwax a hearing because, implicit in that denial, is a conclusion that Weatherwax's factual allegations were frivolous. We have concluded to the contrary, and move to the second level of inquiry under Dawson, whether this non-frivolous claim of trial counsel's handling of juror misconduct demonstrates ineffectiveness of counsel.

## V.

We look first to whether trial counsel's failure to request a voir dire when informed that the jury carried the newspaper into the juryroom arguably falls below the objective standard of reasonableness announced in Strickland. The proper standard for attorney performance is that of reasonably effective assistance under "prevailing professional norms." 466 U.S. at 694.

Of course, there are no bright lines by which we evaluate attorney performance. The range of situations encountered by defense counsel and tactical decisions made in addressing them dictate against establishment of uniform rules speaking to the appropriateness of any particular response to criminal representation. In Strickland, however, the Supreme Court indicated that the American Bar Association Standards for Criminal Justice can be employed as advisory guidelines for reasonableness determinations. 466 U.S. at 688. We thus refer to ABA Standard for Criminal Justice § 4-5.2 (2d ed. 1980 & Supp. 1986) which concerns the function of the defense in control and direction of a case.[3] This section advises

--------

[3] Our reference to these non-mandatory standards is, however, not to be construed as an adoption of their tenets.

422

that important matters of strategy should be within the province of the lawyer after client consultation. The commentary to the Standard notes that convictions which have been reversed for failure of counsel to call witnesses, to cross-examine, and to lodge objections have been decided on the basis that counsel ignored the client's wishes on such matters. On the other hand, when counsel's decisions were strategic or tactical in nature, "[o]nly when behavior revealed ineptitude, inexperience, lack of preparation or unfamiliarity with basic legal principles did [these] actions amount to ineffective assistance of counsel." Id. commentary at 4.67–68.

■ The record here does not reveal whether trial counsel made a deliberate strategic decision concerning the juror with the newspaper. At best, the uncontradicted affidavits, considered as true, reveal a disregard for the implications of the juror's activities. Thus, under the ABA standards, trial counsel's inaction here would indicate that representation was deficient unless the district court determines he decided to forego voir dire because he thought the jury was favorable to his client, as the affidavit of Ms. Lay partially suggests.

In addition to the ABA Standard, in our independent judgment, we find that the failure to call the court's attention to the incident based upon indifference falls below the Strickland objective standard of reasonableness. That a juror acted contrary to the court's admonition to avoid the newspapers, an instruction which was given here, would require counsel to inform the court that its instruction had been disregarded. The additional fact that the paper contained an article with inaccurate information about the trial and his client's testimony unquestionably compelled counsel to alert the court about the juror activity. Absent such a finding, it would appear that counsel failed to employ *any* strategy, a failure that is clearly beneath practice norms.

If the jurors had read the damaging article with its distorted reporting of Weatherwax's testimony, the likelihood of resulting taint to the fairness of the trial is apparent. Strickland's prong would also be met.

■ A finding of prejudice is also supported by our holding in Resko. Prejudice should not be presumed; but when juror misconduct is coupled with the trial court's failure to hold a voir dire to determine the outcome of the misconduct on the jury function,

proof of actual prejudice is excused and a new trial is warranted. 3 F.2d at 695. We recognize that Resko was a direct appeal of a criminal conviction and thus is not directly applicable here, but Weatherwax presents a stronger case for prejudice than Resko: here we are able to review the inflammatory information, the newspaper article, to which the jury may have been exposed and, as we have already determined, its inaccuracy clearly favored the prosecution.

## VI.

Given Weatherwax's allegations, supported by his affidavits and exhibits, the district court erred in not holding an evidentiary hearing to determine the truth of Weatherwax's assertions that a juror brought the newspaper into the juryroom and that counsel was informed that this situation had occurred. If true, Weatherwax has made out a prima facie case of ineffective assistance of counsel under the Strickland standard. The government must then be afforded the opportunity to question Weatherwax's counsel relative to his failure to request the voir dire in order to show, if applicable, that counsel proceeded on the basis of "sound trial strategy." Strickland, 466 U.S. at 689.

We find that the other allegations raised in the petition are without merit.[4] We will, therefore, vacate the denial of the writ and remand the matter to the district court to conduct an evidentiary hearing.

---

[4] See supra notes 1, 2.