UNITED STATES of America

v.

Joseph CIANCAGLINI.

Civil No. 96–3920.
Criminal No. 88–00003–04.

United States District Court,
E.D. Pennsylvania.

Nov. 13, 1996.

David E. Fritchey, Asst. U.S. Atty., Philadelphia, PA, for the Government.

Diane V. Elliott, Easton, PA, for defendant.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

### I. INTRODUCTION

On November 19, 1988 Joseph Ciancaglini was convicted by a jury in a major mafia trial of RICO, RICO Conspiracy, and Unlawful Distribution of Methamphetamine. Post trial motions were denied and he was sentenced to a forty-five year term of imprisonment on May 10, 1989. *United States v. Scarfo*, 711 F.Supp. 1315 (E.D.Pa.1989). Mr. Ciancaglini appealed his conviction, *United States v. Pungitore*, 910 F.2d 1084 (3d Cir.1990); it was affirmed and his petition for certiorari was denied. 500 U.S. 915, 916, 111 S.Ct. 2009, 2010, 2011, 114 L.Ed.2d 98 (1991).

Mr. Ciancaglini now petitions this court for habeas corpus relief pursuant to 28 U.S.C. § 2255. He claims that his trial counsel, Nicholas Nastasi, Esq., afforded him ineffective assistance of counsel. Specifically, Mr. Ciancaglini claims that Mr. Nastasi failed to move for severance at trial, failed to prepare for trial, failed to make a motion in limine to keep out evidence regarding John Ciancaglini, failed to make an effective opening argument, failed to object to the use of perjured testimony by the prosecutor, failed to cross-examine Thomas DelGiorno with prior inconsistent statements, failed to call John Santilli as a witness, failed to object to the prosecutor's improper vouching during closing arguments, and failed to make an effective closing argument. We held a hearing on Mr. Ciancaglini's motion on September 16, 1996; however, he elected not to testify or present any evidence beyond certain stipulations of record. Mr. Ciancaglini was represented by counsel at the hearing. We will address each of Mr. Ciancaglini's claims in turn.

### II. DISCUSSION

#### A. Standard

Mr. Ciancaglini has based his habeas corpus petition on his alleged lack of effective assistance of counsel at trial. To obtain relief on this ground, the Supreme Court has set out a two-prong test wherein the petitioner must prove both prongs; a finding against the petitioner in either area is sufficient to find for the government. A petitioner must show both that: (1) his counsel's conduct was deficient, and "fell outside the wide range of professionally competent assistance" and (2) the petitioner was prejudiced as a result of that deficient conduct. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *United States v. DeRewal*, 10 F.3d 100, 104 (3d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1544, 128 L.Ed.2d 196 (1994).

To satisfy the first prong, a petitioner must show that his counsel's conduct fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064–65. In evaluating such a claim, we "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at

689, 104 S.Ct. at 2065. We may not use the benefit of hindsight to second-guess tactical decisions made by an attorney unless they are unreasonable. *See Id.* at 690, 104 S.Ct. at 2065–66; *Diggs v. Owens,* 833 F.2d 439, 444–45 (3d Cir.1987) ("An attorney is presumed to possess skill and knowledge in sufficient degree to preserve the reliability of the adversarial process and afford his client the benefit of a fair trial. Consequently, judicial scrutiny of an attorney's competence is highly deferential."), *cert. denied,* 485 U.S. 979, 108 S.Ct. 1277, 99 L.Ed.2d 488 (1988). Moreover, the mere fact that a tactic has been unsuccessful does not necessarily indicate that it was unreasonable. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

■ To guide us in determining the reasonableness of the attorney's performance, the Supreme Court in *Strickland* noted that the American Bar Association Standards may be referred to as a guideline. *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064–65; *See also, Government of the Virgin Islands v. Weatherwax ("Weatherwax I"),* 20 F.3d 572, 579 (3d Cir.1994), *rev'd on other grounds, Government of the Virgin Islands v. Weatherwax ("Weatherwax II"),* 77 F.3d 1425, 1435 (3d Cir.1996).

■ One of the most relevant standards in this context is ABA Standard for Criminal Justice § 4–5.2 (3d ed. 1993), "Control and Direction of the Case." This section dictates which decisions are ultimately to be made by the defendant, and which are to be made by the defense counsel. Specifically, strategic and tactical decisions such as which witnesses to call, whether to conduct cross-examination, and what trial motions to make are within the province of the attorney after consultation with the client. ABA Standard 4–5.2(b). The Commentary thereto states that when the attorney in question makes such strategic or tactical decisions, "[o]nly when [his] behavior revealed ineptitude, inexperience, lack of preparation or unfamiliarity with basic legal principles [will these] actions amount to ineffective assistance of counsel." *Weatherwax I,* 20 F.3d at 579, *citing* Commentary at 4.67–68. Therefore, if a decision falls within the realm of "strategic decisions" to be made by the attorney, we will find

whatever decision that attorney made to be sufficiently deficient *only* if he either failed completely to consult with his client, or if the decision was itself inept or incapable of interpretation as sound.

■ If the first prong is proven, a petitioner must also prove the second prong, prejudice. A petitioner must show that there is a reasonable probability that there would have been a different outcome; that the deficient performance "deprived the defendant of a trial whose result is reliable." *DeRewal,* 10 F.3d at 104, *citing Strickland,* 466 U.S. at 690, 104 S.Ct. at 2065–66. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. We must examine the trial with our focus not on the outcome, but on whether the error so affected the adversarial balance that the trial was rendered unfair and the verdict rendered suspect. *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180 (1993).

### B. Failure to Move for Severance

■ Mr. Ciancaglini first claims that Mr. Nastasi was ineffective by failing to move for severance at any point before or during the trial. He states that there was a conflict of interest between his defense and lead defense counsel, Robert Simone, in that Mr. Simone was at various points referred to by government witnesses as being involved in the criminal activity of the defendants. Because Mr. Simone was "inextricably tied" to him, Mr. Ciancaglini argues that the failure to move for severance amounts to ineffective assistance of counsel. *See Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2255 ("Petition"),* at 3.

The decision of whether to make a motion falls clearly within the realm of "attorney decisions." *See Weatherwax II,* 77 F.3d at 1435. To overcome the presumption that his counsel's actions were within the objective standard of reasonableness, Mr. Ciancaglini must show that Mr. Nastasi's decision not to move for severance was not sound trial strategy. *See Darden v. Wainwright,* 477 U.S. 168, 169, 106 S.Ct. 2464, 2465–66, 91 L.Ed.2d

144 (1986). If there exist good strategic reasons for his decision, we may not find Mr. Nastasi ineffective merely because we may have made a different choice.

In his uncontroverted affidavit, Mr. Nastasi states that he considered the possibility of moving for severance, and decided against it. He stated as his reasons the fact that it was improbable that the motion would be granted given the complexity of the case and co-defendant Joseph Pungitore's failure with the same motion, that a motion for dismissal on double jeopardy grounds was more likely to succeed, and that an overall unified defense strategy would be far more effective. *Affidavit of Nicholas J. Nastasi ("Affidavit")*, at 3–4. He stated that it was his experience that motions to sever were rarely successful, and that he "knew that within the year preceding the instant trial, the unified defense strategy had worked twice for the individuals identified in the charges as members of an enterprise charged as the Philadelphia LCN family." *Id.* at 4.

■ This circuit has repeatedly held that "effective assistance does not demand that every possible motion be filed, but only those having a solid foundation." *United States v. Swinehart*, 617 F.2d 336, 341 (3d Cir.1980); *United States v. Hines*, 470 F.2d 225, 232 (3d Cir.1972), *cert. denied*, 410 U.S. 968, 93 S.Ct. 1452, 35 L.Ed.2d 703. Motions to sever are disfavored in complex cases. The instant case involved seventeen defendants, numerous charges, and lasted for fifty-three trial days. It was indeed the epitome of a very long and complex case. Mr. Ciancaglini's co-defendant Joseph Pungitore had already filed a pre-trial motion for severance which had been denied by the court. That denial was ultimately affirmed on post-verdict motions. *United States v. Scarfo*, 711 F.Supp. 1315, 1340–42 (E.D.Pa.1989). *aff'd, United States v. Pungitore*, 910 F.2d 1084 (3d Cir.1990). Most importantly, the seventeen defense counsel involved in this case elected to pursue an overall unified defense strategy which consisted primarily of denying the existence and criminal purpose of the La Cosa Nostra, denying the defendants' participation in it, and denying the credibility of the government's principal cooperating witnesses. In light of this, Mr. Nastasi's decision was not only not unreasonable; on the contrary, it was a deliberate tactical decision well within the bounds of reasonable professional assistance.

### C. Failure to Properly Prepare for Trial

■ Mr. Ciancaglini next claims that Mr. Nastasi was ineffective in his preparation for trial. This claim seems to be a conglomeration of his other complaints in that Mr. Ciancaglini argues that Mr. Nastasi would never have done the other allegedly ineffective acts but for a lack of preparation. He further argues that Mr. Nastasi "never discussed trial strategy, a defense or went over any of the discovery with [him]." *Petition* at 5.

Despite Mr. Ciancaglini's all inclusive 'kitchen-sink' approach, we will give this charge our serious consideration. This Circuit noted in *Weatherwax* [II] that any decision by counsel to not prepare or investigate must be "directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to the counsel's judgements." *Weatherwax II*, 77 F.3d at 1432, *citing Strickland* 466 U.S. at 690–691, 104 S.Ct. at 2065–67.

In this case, however, Mr. Ciancaglini's claims are not supported in any way by the evidence. In his uncontroverted affidavit, Mr. Nastasi states that he fully discussed the charges, and possible witnesses with Mr. Ciancaglini and interviewed those witnesses that were identified as potentially helpful. *Affidavit* at 4. He found that most of these witnesses were unable to provide helpful testimony, but did find and prepare attorney Anna Durbin to testify. *Id.* Further, Mr. Nastasi was apparently in charge of discovery materials for the unified defense, a task which belies a lack of preparation. Mr. Ciancaglini has chosen to provide no evidence to the contrary, as he must do to prevail. *See Zettlemoyer v. Fulcomer*, 923 F.2d 284, 298 (3d Cir.1991) (Holding that the petitioner "cannot meet his burden to show that counsel made errors so serious that his representation fell below an objective standard of reasonableness based on vague and conclusory allegations ..."), *cert. denied*, 502 U.S. 902, 112 S.Ct. 280, 116 L.Ed.2d 232 (1991).

■ The cases cited by Mr. Ciancaglini are inapposite. *Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986), dealt with an attorney who completely failed to conduct pre-trial discovery and whose file pertaining to the case was devoid of any trial preparation. *Baty v. Balkcom,* 661 F.2d 391 (5th Cir.1981) concerned an attorney who spent only thirty minutes with his client prior to trial, interviewed no witnesses, and conducted no investigation. These are simply not the facts of the instant matter; Mr. Ciancaglini provides no evidence to the contrary. Both of the above cases also noted that counsel's actions during trial are not dispositive of a failure to prepare sufficiently. Counsel's actions must instead be examined in the context of the evidence of the degree of before-trial preparation. Moreover, if evidence can be quickly gathered from other sources, such as other defense counsel in the matter, less personal investigation by counsel is not dispositive. *See Kimmelman,* 477 U.S. at 387; 106 S.Ct. at 2589; *Baty,* 661 F.2d at 395. In the case at hand, there is nothing to indicate that Mr. Nastasi was not fully and adequately prepared for trial. His actions were therefore well within the bounds of effective assistance.

*D. Failure to File a Motion In Limine to Keep Out Evidence Regarding John Ciancaglini*

Mr. Ciancaglini's third allegation of ineffective assistance stems from Mr. Nastasi's decision to not file a motion to keep out evidence pertaining to Mr. Ciancaglini's son, John Ciancaglini, and thereafter not objecting to the introduction of such evidence. John Ciancaglini was an unindicted co-conspirator whose name was mentioned infrequently during the trial; however, Mr. Ciancaglini argues that the testimony regarding his son was without probative value and confused the jury.

■ As noted previously, the decision to file a motion, such as a motion in limine to exclude evidence, is within the realm of decisions to be made by the attorney. ABA Model Rule 1.2. The decision is therefore examined to determine if it was a reasonable tactical choice under the circumstances.

Certainly, "an attorney's judgment need not necessarily be right, so long as it is reasonable." *Weatherwax II,* 77 F.3d at 1435. The decision whether to object is similarly examined. An attorney is not required to bring meritless motions, and will not be found ineffective for refusing to do so.

■ In the instant case, Mr. Ciancaglini has not overcome the presumption that his attorney's actions in this area were based on sound trial strategy. Mr. Nastasi states in his affidavit that he did not bring the motion because he felt it would have been frivolous. *Affidavit* at 5. John Ciancaglini, while not a defendant, was an unindicted co-conspirator whose activities were directly relevant to the various racketeering acts charged within the RICO count of the indictment. In particular, there was evidence that when a dispute arose between John and others, John went to his father for advice and his father told him that he would have to follow Nicodemo Scarfo's orders. The evidence pertaining to John Ciancaglini was therefore highly relevant and in balance had a lesser degree of prejudicial value. Given the highly complex nature of the case and the amount of work involved, it is not surprising that Mr. Nastasi made the tactical decision to not spend time writing motions that would no doubt be denied. Moreover, even if Mr. Nastasi's decision were ineffective, we note that for the above reasons, the motion would have been denied; Mr. Ciancaglini has thusly suffered no prejudice.

Mr. Ciancaglini also argues that Mr. Nastasi should have objected to the mentioning of John Ciancaglini because it was confusing for the jury. However, we have performed an exhaustive search of the transcripts of this trial and note that during the two days where John Ciancaglini was mentioned the most, October 17 and 18, 1988, the government was very careful to differentiate between father and son. The prosecutor, Mr. Fritchey, repeatedly asked the witnesses for clarification when the witnesses referred to individuals solely by their last name. When John Ciancaglini was mentioned, Mr. Fritchey almost always distinguished him from his father. *See, e.g., Transcript,* October 17, 1988 at 112 ("Q: Alright, and he [John Cian-

caglini] is a different person from the Joseph Ciancaqini [sic] whose [sic] a defendant on trial here; am I correct in saying that?" A: "That's correct."). John Ciancaglini was time and again distinguished from his father; the jurors were permitted to take notes, and there was very little if any possibility of confusion under the circumstances. Given this evidence, Mr. Nastasi's decision not to object was eminently reasonable. Indeed, to do otherwise would have been to draw further attention to his client; this would have been in direct conflict with his stated strategy.

### E. Failure to Make an Effective Opening Argument

Mr. Ciancaglini next complains that Mr. Nastasi's opening argument was deficient because he delivered it subsequent to the closing of the government's case. He further states that the substance of the opening argument was insufficient because it did not individualize him. *Petition* at 14.

■■■ While courts have weighed heavily in favor of permitting them, there is no unfettered constitutional right to an opening statement. *See United States v. Zielie,* 734 F.2d 1447, 1455 (11th Cir.1984) (*citing Herring v. New York,* 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975)), *cert. denied,* 469 U.S. 1189, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985); *see also United States v. Salovitz,* 701 F.2d 17, 20 (2nd Cir.1983). Certainly, there is no requirement that the opening statement be made before the beginning of the government's case. It is a matter of trial strategy, and waiver or delay of such statements is purely a matter of professional judgement. *See Salovitz,* 701 F.2d at 21; *United States v. Decoster,* 624 F.2d 196, 213–14 (D.C.Cir.), *cert. denied,* 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979). As such, the timing of the opening statement will rarely form the basis of a claim of ineffective assistance of counsel.

■■■ Mr. Nastasi did not waive his opening statement; rather, he made the decision to open after the government rested. *Affidavit,* at 6. This is not unusual under the circumstances. With seventeen defendants and a unified defense, it was simple logic for all counsel involved to cooperate. If each attorney had made a full opening statement without regard to what had already been said by the others, it is clear that the jury might have quickly become bored. However, because counsel agreed to have six attorneys open at the beginning of the trial, and only Mr. Nastasi open at the close of the government's case, the defendants collectively received the best of both worlds. Ten of the defendants waived opening entirely. As Mr. Nastasi's unrefuted affidavit notes, the other attorneys collaborated on his and the other openings, to ensure that all major points were brought out. This type of planning and organization is well within the bounds of reasonable attorney behavior.

■■■ Mr. Ciancaglini also complains that Mr. Nastasi's opening was not individualized enough toward his client. However, as has already been shown, this was in line with Mr. Nastasi's overall strategy of not drawing attention to Mr. Ciancaglini. Compared to the overwhelming amount of evidence on tape against his co-defendants, there was less regarding Mr. Ciancaglini; Mr. Nastasi's strategy was one not foreign to multi-defendant criminal defense: "that [his client] would be lost in the shuffle of the evidence." *Affidavit,* at 6–7. We have reviewed Mr. Nastasi's opening argument in detail. He renewed arguments made fully at the beginning of the trial, and prepared the jury to note the differences in the types of witnesses that would be presenting evidence. We are satisfied that the tactical decisions made were competent and certainly fall within the objective standard of reasonableness.

### F. Failure to Object to the Use of Perjured Testimony by the Prosecutor

■■■ Mr. Ciancaglini next argument is twofold. He argues first that the witness Thomas DelGiorno committed perjury when he testified on October 12, 1988 about a drug transaction that he brokered between John Santilli and Vinnie Perry. He then argues that it was ineffective assistance of counsel for Mr. Nastasi to fail to object to the aforementioned perjury. As such, this complaint necessarily rises and falls on the question of whether Mr. DelGiorno committed perjury.

We have extensively reviewed the transcripts of Mr. Delgiorno's testimony, and find no such perjury. On October 12, 1988 Mr. DelGiorno testified as follows:

Mr. Gordon (government): ... In approximately May of 1983 did you participate in a drug transaction involving John Santilli and Vinnie Perry?

Mr. DelGiorno: Yes.

Q: Would you describe what happened?

A: Vinnie Perry wanted to meet Johnny Santilli because he knew Johnny Santilli had meth—meth.

Q: Is meth an illegal drug?

A: Yes. So I went to Ciancaglini and told him that I could make these two guys get together and we could grab 3,000 on every pound Johnny gave to Vinnie. So me and him went to Chuckie and Chuckie told us, "okay, do it."

Q: Now, which Ciancaglini did you go to?

A: Joseph Ciancaglini.

Q: And when you went to Chuckie and he said, "Okay, do it," who were you talking about?

A: Salvatore Merlino.

Q: Who would go into Chuckie with you?

A: Me and Ciancaglini.

Q: What position was Chuckie in at that time?

A: He was an under boss.

Q: And what position was Ciancaglini in at that time?

A: He was an under boss.

Q: And how were you going to grab or make $3,000 for each pound?

A: Well I made Johnny Santilli charge me 7 and I charged Vinnie Perry 10.

Q: Did the drugs actually pass through your hands or did they just go from one of those two people to the other one?

A: I just introduced them. I didn't touch the drugs. I didn't see the drugs.

Q: And on the first series of transactions that you participate[d] in, how much money did you make?

A: On that whole deal then?

Q: Yes.

A: $150,000.

Q: And approximately how many transactions were there at that time?

A: About ten. Ten or five. Five or ten.

Q: How many pounds were involved?

A: Fifty.

Q: And how was—or how were the profits from that series of transactions divided?

A: Well the original agreement was I was supposed to keep a third, Ciancaglini was supposed to keep a third, and he was supposed to give a third to Chuckie and Scarfo.

*Transcript,* October 12, 1988 at 30–32.

Mr. Ciancaglini makes his charge of perjury based on earlier testimony by Mr. DelGiorno. Specifically, he makes reference to Mr. DelGiorno's grand jury testimony of March 25, 1987 and his testimony in another trial, *United States v. Scarfo, et al.,* E.D.Pa.Criminal No. 87–258 on April 6, 1988. In the Grand Jury, Mr. DelGiorno testified about monies received from shakedowns of bookmakers and distributed regularly, and differentiated those monies from what was referred to as "extras", or monies received from the shakedowns of drug dealers. The proceeds of extras were more irregular, and Mr. DelGiorno testified that Mr. Ciancaglini did not receive them. *Grand Jury Notes,* March 25, 1987 at 17–18, *cited in Petition,* at 17. In the other trial, Mr. DelGiorno testified about his involvement with John Santilli: "I helped him get an attorney. I wasn't involved in the drug business with him." *DiTullio Transcript,* April 6, 1988, at 99–100, *cited in Petition,* at 18.

A thorough reading of both the previous testimonies and the testimony given at the instant trial does not reveal any perjury. At the very most, the testimony is slightly inconsistent, and the presentation of inconsistent evidence is not improper. *United States v. Necoechea,* 986 F.2d 1273, 1280 (9th Cir. 1993). The act for which Mr. Ciancaglini was charged and convicted was drug trafficking, not extortion of money from drug traffickers. Thus it was consistent for Mr. DelGiorno to testify that Mr. Ciancaglini received no monies from the shakedowns of drug dealers and at the same time that he did receive monies from the arrangement of a drug deal.

As for the statement during the trial on March 30, 1988, it must be kept in mind that, as Mr. Caramandi explained during the same trial, there is a perceived difference by those involved with the mob between "being in the drug business," which is prohibited within the mob, and brokering drug transactions, which is not. Therefore, it is entirely probable that Mr. DelGiorno could testify both that he and Mr. Ciancaglini were not involved with the drug business and that they profited from an arranged drug sale between John Santilli and Vinnie Perry and not be lying at either point.

We find that no perjury was committed, and that Mr. Nastasi was therefore not deficient in his failure to object to the testimony.

*G. Failure to Cross–Examine Thomas DelGiorno with Prior Inconsistent Statements Regarding Petitioner's Involvement in a Drug Transaction.*

■ Relying on the same statements by Mr. DelGiorno that are discussed above, Mr. Ciancaglini next argues that Mr. Nastasi performed ineffectively by failing to cross-examine Mr. DelGiorno regarding those statements. He argues that the inconsistent statements, if brought out in cross-examination, would have shown Mr. DelGiorno to be a liar and would have lead to his acquittal. *Petition* at 22.

Whether and how to conduct cross-examinations are tactical decisions that fall squarely within the domain of the attorney. ABA Standards § 4–5.2(b); *See Comment* to ABA Model Rule 1.2; *Weatherwax II*, 77 F.3d at 1433. Certainly, given the above discussion, Mr. Nastasi's decision to not cross examine Mr. DelGiorno was reasonable. According to Mr. Nastasi's uncontroverted affidavit, the strategy involved with Mr. DelGiorno as well as all the other government witnesses was to bring out their "sordid criminal career and the benefits [they] expected to receive from the government in return for [their] cooperation." *Affidavit*, at 8. Mr. Nastasi did not want to focus unneeded attention on Mr. Ciancaglini, and knew that Mr. DelGiorno could easily explain whatever inconsistencies existed to the detriment of Mr. Ciancaglini. Moreover, Mr. DelGiorno was extensively cross-examined on every issue including the

drug transaction with Mr. Santilli and Mr. Perry, with a strong emphasis on Mr. Delgiorno's lack of credibility. *See Transcript*, October 13, 1988 at 86–180 (Simone); October 14, 1988 at 8–116 (Simone), 116–142 (Goodman), 142–202 (Jacobs) (193–196 cross-examine regarding drug transaction), 202–220 (Reif); October 15, 1988 at 3–23 (Reif), 23–35 (Lefeber), 35–58 (Furlong), 58–103 (Madden), 103–107 (Marino), 107–117 (Pinsky), 117–122 (Capone), 122–136 (LaCheen), and 136–157 (Santaguida). After three straight days of cross-examination on every conceivable issue, the rest of the attorneys, Mr. Patrizio, Mr. Scuderi, Mr. Berry, Mr. Nastasi, and Mr. Savino, decided not to cross-examination clearly out of fear of boring the jury. Certainly, Mr. Nastasi's decision to not cross-examine Mr. DelGiorno in light of these circumstances and his desire not to call attention to his client was reasonable and not deficient.

*H. Failure to Permit Mr. Ciancaglini to Testify*

■ Mr. Ciancaglini initially claimed that Mr. Nastasi refused to permit him to testify, despite his desire to do so. The decision whether or not to testify is extremely important, and thus one left entirely to the defendant. ABA Standards for Criminal Justice, Standard 4–5.2; ABA Model Rule 1.2. While the defendant may and should receive advice from his attorney, this fundamental right cannot be contravened by an attorney even if the defendant's decision causes strategic damage.

However, Mr. Nastasi did not refuse to allow Mr. Ciancaglini to testify; rather, it was a decision that Mr. Ciancaglini voluntarily made himself. Mr. Ciancaglini also did not want to testify and be subject to cross-examination at the hearing held before this court on September 16, 1996. A stipulation was reached with the agreement of both counsel and Mr. Ciancaglini at this hearing. The government stated the stipulation:

my understanding of Mr. Nastasi's testimony was that his client very strongly wanted to testify and ... Mr. Nastasi discussed the pros and cons of testimony with him and the dangers inherent in it, partic-

ularly from the fact that he would be cross-examined in all likelihood about an extremely wide ranging scope of incidents, plus also it would tend to make him stand out as among the other defendants and Mr. Nastasi's strong recommendation—as I understand it—was that he not testify, because, A, it would—it would place his credibility very much in the forefront, where it hadn't been otherwise ... in the context of the joint trial and, B, because he would just be obliged to answer a huge number of questions, many of which he might want to take the Fifth on and that would be, obviously, disastrous. And my understanding from Mr. Nastasi was that once he explained this to Mr. Ciancaglini, Mr. Ciancaglini saw the wisdom of his position, even though he sort of viscerally wanted to testify, but without it being limited in scope to the specifics that he wanted to talk about, it seemed to both of them that it was an unwise thing to do and, consequently, Mr. Ciancaglini ultimately accepted Mr. Nastasi's advice that he not testify."

*Transcript,* September 16, 1996 at 9.

When Mr. Ciancaglini was asked in open court if he stipulated to the above, he said, "yes." *Id.* at 10. Clearly, Mr. Ciancaglini had the right to testify and chose, of his own volition, not to. Mr. Nastasi's advice was reasonable given the facts; Mr. Ciancaglini's instant complaint is therefore completely without merit.

Moreover, any claim that a defendant in the instant case was not permitted to take the stand by his attorney despite expressing a desire to do so is contrary to the trial record. At the close of the defense case, the jury was excused and attorney Simone, who was acting as lead counsel for the defendants, stood in front of the bench and asked the following of all the defendants at the request of the court:

With that, your Honor, we would move into evidence the exhibits that have been marked during the government's case, as well as those few that have been marked during the defense case, and I believe, if anybody disagrees with me raise their

hand, I believe all of the defendants would rest, is that correct?

*Transcript,* November 9, 1988 at 110–11. We looked about the courtroom and as the record reflects, there was no response from anybody. The meaning of the question was clear and any defendant who wanted to testify could have so indicated at that time.

*I. Failure to Call John Santilli as a Witness.*

█ Mr. Ciancaglini's eighth claim of ineffective assistance of counsel stems from Mr. Nastasi's decision to not call John Santilli as a witness. Mr. Santilli was a member of the drug transaction discussed above. Mr. Ciancaglini presents us with no support for the contention that Mr. Nastasi either was required to, or should have, called Mr. Santilli to the witness stand.

█ The decisions of which witnesses to call to testify are strategic and therefore left to counsel. *See* ABA Standards of Criminal Justice, Standard 4–5.2; *Diggs v. Owens,* 833 F.2d 439, 446 (3d Cir.1987), *cert. denied,* 485 U.S. 979, 108 S.Ct. 1277, 99 L.Ed.2d 488 (1988). Attorneys are not required to call every witness suggested to them; their expertise leads them to choose only the witnesses likely to assist the case. *United States v. Balzano,* 916 F.2d 1273, 1294 (7th Cir.1990); *see also United States v. Griffin,* 1993 WL 34927 (E.D.Pa.) (Feb. 9, 1993), *aff'd,* 16 F.3d 406 (1993). Indeed, this is precisely the type of strategic decision which the Court in *Strickland* held to be protected from second-guessing. *See Sanders v. Trickey,* 875 F.2d 205, 212 (8th Cir.), *cert. denied,* 493 U.S. 898, 110 S.Ct. 252, 107 L.Ed.2d 201 (1989). "Mere criticism of a tactic or strategy is not in itself sufficient to support a charge of inadequate representation." *United States v. Vincent,* 758 F.2d 379, 382 (9th Cir.), *cert. denied,* 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed.2d 95 (1985).

In the instant case, Mr. Nastasi did not call Mr. Santilli for several very good reasons. According to his uncontested affidavit, Mr. Nastasi had no indication that Mr. Santilli had anything exculpatory to offer on Mr. Ciancaglini's behalf. Additionally, it would have been inconsistent with the defense

strategy of only calling witnesses with "clean records and positive reputations" to accentuate the unsavoriness of the government witnesses. *Affidavit*, at 10. It would have called additional attention to Mr. Ciancaglini, which was contrary to the overall defense strategy we discussed above. These strategies all constitute reasonable conduct and professionally competent assistance; Mr. Ciancaglini simply cannot play "monday-morning quarterback" to Mr. Nastasi's able and tactical trial decisions.

*J. Failure to Object to Prosecutor's Comments During Closing Which Constituted Improper Vouching For a Government Witness.*

Mr. Ciancaglini next makes another twofold argument. He first argues that the government improperly vouched for its witnesses during closing. Based on that, he states that Mr. Nastasi was deficient by not objecting to the vouching. Therefore, we must first turn our attention to the question of whether there was vouching by the government at all.

Mr. Ciancaglini makes reference to both the government's closing, in which the government discussed Mr. DelGiorno's and Mr. Caramandi's credibility, and the government's rebuttal, in which the government discussed the credibility of the law enforcement personnel that had testified. Generally, it is improper for a prosecutor to vouch for the veracity of a government witness. "Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony." *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir.1980) (*citing Lawn v. United States*, 355 U.S. 339, 359–60 n. 15, 78 S.Ct. 311, 322–23 n. 15, 2 L.Ed.2d 321 (1958)), *cert. denied*, 452 U.S. 942, 101 S.Ct. 3088, 69 L.Ed.2d 957 (1981). We have reviewed the entire transcript of the government's closing, and can find no vouching whatsoever in reference to Mr. Caramandi or Mr. DelGiorno. The prosecutor merely argued the evidence in the record; he did nothing improper. Since there is absolutely no evidence that any perjury was committed, or that the government

had knowledge thereof, reference to the testimony of the government witnesses in closing is entirely appropriate.

We have also reviewed the government's rebuttal. Mr. Ciancaglini references the Third Circuit's opinion in *United States v. Pungitore*, in which the circuit court noted that there were portions of the rebuttal summation in which the prosecutor "attempted to bolster the credibility of testifying law enforcement personnel and the prosecutorial team by invoking facts which had no foundation in the record." *Pungitore*, 910 F.2d 1084, 1125 (3d Cir.1990). The court went on to state that the defendants had not preserved their objections for appeal, and therefore, the *per se* error rule delineated in *United States v. DiLoreto*, 888 F.2d 996 (3d Cir. 1989) could not apply. Mr. Ciancaglini argues that Mr. Nastasi's failure to object during trial constituted deficient assistance.

However, we note first that the *per se* error rule in *DiLoreto* was overruled by the Third Circuit in *United States v. Zehrbach*, 47 F.3d 1252 (3d Cir.1995) ("the *per se* reversal standard announced in *DiLoreto*, however, conflicts with the Supreme Court case law requiring the court to analyze prosecutorial comments case by case, in the context of the entire trial, and reverse only where the defendant has suffered prejudice."), *cert. denied*, — U.S. —, 115 S.Ct. 1699, 131 L.Ed.2d 562 (1995). As a result, Mr. Nastasi's failure to object is not inherently error. Instead, the prosecutor's comments in the rebuttal summation must first be reviewed pursuant to the harmless error doctrine to determine if the defendant received a fair trial before we can decide if it was unreasonable to not object. *Id.* at 1267.

The Third Circuit has already held that the comments made in this case by the prosecutor in rebuttal were an "invited response." *Pungitore*, 910 F.2d at 1123. The Third Circuit further explained this kind of issue in *United States v. Pelullo*, and noted that "where there is no foundation for the defendant's assertions, the prosecutor will undoubtedly feel the need to respond during rebuttal which often leads to improper vouching as to the credibility of witnesses or to the prosecutor's own integrity or that of his or

her office. Where the defense has made improper remarks, the "reply" or "invited response" doctrine permits the prosecution to attempt to neutralize the remarks, so long as he or she does not use the defendant's accusation as a springboard affirmatively to attack the defense." *United States v. Pelullo,* 964 F.2d 193, 218 (3d Cir.1992); *See United States v. Young,* 470 U.S. 1, 12–13, 105 S.Ct. 1038, 1044–45, 84 L.Ed.2d 1 (1985).

In the instant case, the unified defense strategy focused on attacking the credibility of all of the government witnesses, and the credibility of the numerous law enforcement involved. The Third Circuit recounted in *Pungitore* the various defense closings, and stated, "[defense attorney Simone] analogized the prosecution of the Scarfo family to the government's attempt to bury unions in the 1930's, the interment of the Japanese during World War II, the blacklisting of communists during the McCarthy era, the circumstances leading to the Kent State riots, the persecution of Vietnam protestors, and ultimately, in his *piece de resistance,* to the Spanish Inquisition." *Pungitore,* 910 F.2d at 1122. The defendants, in several different closings, were clearly suggesting that the law enforcement personnel had fabricated testimony against the defendants. The rebuttal statements of the prosecutor, while zealous, were made only in response to the defendants' collective allegations, and were therefore not improper under the circumstances.

Since the government's comments in closing were not improper vouching, Mr. Nastasi's failure to object is not deficient conduct. He notes in his affidavit that he did not object because "no vouching occurred." *Affidavit,* at 11. This is assuredly a reasonable interpretation of the facts.

### K. *Failure to Make an Effective Closing Argument to the Jury on Petitioner's Behalf*

 Finally, Mr. Ciancaglini argues that Mr. Nastasi's closing argument was ineffective. He states that the summation was short, and did not adequately discount the testimony of witnesses. *Petition* at 28. The Supreme Court has held there to be a constitutional right to a summation; it cannot be denied to the defendant. *See Herring v.*

*New York,* 422 U.S. 853, 863, n. 13, 95 S.Ct. 2550, 2556, n. 13, 45 L.Ed.2d 593 (1975). However, a closing argument is usually given in a manner consistent with the theory of the case; a summation cannot therefore be deficient in a manner sufficient to support a claim of ineffective assistance of counsel unless the theory and method of implementing the theory were unreasonable under the circumstances. *See, e.g., Darden v. Wainwright,* 477 U.S. 168, 183, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986).

We have reviewed the transcripts of all of the closings including Mr. Nastasi's. While Mr. Nastasi's summation was indeed brief, it came on the third day of defense closings, near the end of all of the closings. This order of summations may be displeasing to Mr. Ciancaglini, but in a trial with seventeen defendants, the fact remains that someone had to go first and someone had to go last. We will not discredit Mr. Nastasi or anyone else for their position in the order.

In addition, it is clear that Mr. Nastasi's closing was short because of the same reason that so many of the defense counsel chose not to open. There was a finite amount of material to be discussed, and after two days of lengthy closings, the threat of boring and confusing the jury was great. As he states in his affidavit, "by the third morning of defense closings, the defense lawyers had collectively concluded that they had said virtually everything that needed to be said in the summations given up to that time." *Affidavit,* at 12. That feeling was substantiated by a question received that third morning from the jury inquiring how much longer the defense would continue. *Transcript,* November 16, 1988 at 6. Mr. Nastasi effectively hammered home the defense's main theory: the government's case depended on the testimony of the co-operating codefendants and those people were not to be trusted on anything. He boiled the long case, the long closings down to the main issue of credibility and illuminated it nicely. He was able to give an effective closing while maintaining his overall strategy of not focusing undue attention toward his client. In short, given the circumstances, Mr. Nastasi's closing was not deficient.

## III. CONCLUSION

Mr. Ciancaglini has made ten claims of errors by Mr. Nastasi. Nine of these have at best been mere disagreements with strategy, not real allegations of deficiency, and thus they cannot form the basis of an ineffective assistance of counsel claim. The tenth, that Mr. Nastasi denied him the right to testify, has been fully resolved through a stipulation; Mr. Ciancaglini has thereby effectively withdrawn that particular claim. Because in no case was Mr. Nastasi deficient in his performance as counsel, we need not reach the issue of prejudice, although we would have little difficulty in finding that none was caused.

At Mr. Ciancaglini's sentencing hearing on May 10, 1989, we said, "... I have every confidence in your attorney, he's a very competent attorney ...". *Sentencing Transcript*, May 10, 1989 at 17. After a thorough and independent review of the record, we stand by that assessment.

For the foregoing reasons, we will deny Mr. Ciancaglini's petition for relief pursuant to 28 U.S.C. § 2255.

An appropriate order follows.

### *ORDER*

AND NOW, this 13th day of November, 1996, after a hearing in open court, upon consideration of defendant Joseph Ciancaglini's Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2255, and the government's response thereto, it is hereby ordered that the same motion is DENIED.