OPINION
{¶ 1} Appellant, Benjamin J. Cadiou, appeals the judgment entered by the Lake County Court of Common Pleas. Cadiou received a six-year prison term for his conviction for burglary.
 {¶ 2} In January 2005, Diana Powell lived in a house in Mentor, Ohio with her fiancé, Jason Mangelo, and her three-year-old daughter. On January 19, 2005, shortly after 12:00 p.m., Powell returned home early from classes at Lakeland Community College. There were two individuals in her home.
 {¶ 3} Powell heard one of the bedroom doors shut and lock. A short time later, Powell heard the sound of the plastic being ripped off the window. Powell went outside the house and walked to the side of the house. She noticed an individual climbing out of the window. Initially, this individual ran from the window toward Powell. However, upon seeing Powell, the individual ran in the opposite direction. Powell was able to look at this individual's face for about 15 to 20 seconds. When she went back toward the front door, the second individual ran out the front door. The second individual had a hooded sweatshirt covering his face, and Powell was not able to get a good look at this person.
 {¶ 4} Powell called Mangelo at work and informed him about the burglary. She told Mangelo that the first individual looked like their friend "Aaron." Mangelo informed her that if the individual looked like Aaron, it was Cadiou, because Aaron and Cadiou look very similar. Later, in a police lineup and in court, Powell positively identified the individual who climbed from her window as Cadiou.
 {¶ 5} After calling Mangelo, Powell called 9-1-1 and reported the burglary. Officers Michael Orf and Gary Stroud from the Mentor Police Department responded to Powell's residence. They observed footprints in the snow leading from the window where Powell witnessed Cadiou leave her residence. They followed the footprints across the lawns of several properties. The footprints ended on Wake Robin Road. It appeared the individual left in a car, because the footprints stopped and recent tire tracks were left. The footprints ended in front of 4941 Wake Robin Road, which was the residence Cadiou grew up in. At the time of the offense, police records listed 4941 Wake Robin Road as Cadiou's address. However, Cadiou did not actually reside there at that time.
 {¶ 6} The officers searched Powell's residence for fingerprints, but did not find any identifiable fingerprints. In addition, the footprints were not of sufficient quality for the officers to make a casting from.
 {¶ 7} Mangelo grew up in the same neighborhood as Cadiou. While growing up, the two of them played on the same football team. Mangelo testified that he had a random encounter with Cadiou four days before the burglary. At that time, Mangelo casually informed Cadiou that Powell was out of town. In addition, on the night before the burglary, Mangelo watched a red car drive back and forth in front of Powell's residence. He testified that this was Cadiou's vehicle.
 {¶ 8} Cadiou was indicted with one count of burglary, a second-degree felony. Cadiou pled not guilty to this charge, and a jury trial was held. The jury found Cadiou guilty of burglary. The trial court sentenced Cadiou to six years in prison for his conviction.
 {¶ 9} Cadiou raises two assignments of error. His first assignment of error is:
 {¶ 10} "The defendant-appellant's due process rights and right to fair trial [as] guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution were violated by ineffective assistance of counsel."
 {¶ 11} In State v. Bradley, the Supreme Court of Ohio adopted the following test to determine if counsel's performance is ineffective: "[c]ounsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation, and, in addition, prejudice arises from counsel's performance."[1] Moreover, "`a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. * * * If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, * * * that course should be followed.'"[2]
 {¶ 12} Cadiou initially claims that trial counsel should have argued that Powell's identification of him was based on Mangelo's assertion that he was one of the burglars. Trial counsel extensively questioned Powell about her identification of Cadiou and the fact she was given his name by Mangelo. The following colloquy is an example of the cross-examination of Powell on the issue of her identification of Cadiou:
 {¶ 13} "TERRY HESS [defense counsel]: And [Mangelo] told you who he believed may be involved, correct?
 {¶ 14} "DIANA POWELL: Yes.
 {¶ 15} "TERRY HESS: Okay. He mentioned Ben Cadiou's name, right?
 {¶ 16} "DIANA POWELL: Yes.
 {¶ 17} " * * *
 {¶ 18} "TERRY HESS: Now you testified earlier today that one way you were able to identify Ben Cadiou in the photo line up is he looked, in your mind, similar to a person you knew, correct?
 {¶ 19} "DIANA POWELL: Yes.
 {¶ 20} "TERRY HESS: And that person's name is Aaron Milone?
 {¶ 21} "DIANA POWELL: Milhoan.
 {¶ 22} "* * *
 {¶ 23} "TERRY HESS: When Patrolman Stroud came to your house 2 days after this occurred, on Friday the 21st, he showed you 2 photo line ups, correct?
 {¶ 24} "DIANA POWELL: That's correct.
 {¶ 25} "TERRY HESS: And they had 6 photos a piece in them, correct?
 {¶ 26} "DIANA POWELL: Yes.
 {¶ 27} "TERRY HESS: Okay. And he asked you to look at the photos, correct?
 {¶ 28} "DIANA POWELL: Yes.
 {¶ 29} "TERRY HESS: And see if you saw anybody you recognized. Right?
 {¶ 30} "DIANA POWELL: Yes.
 {¶ 31} "TERRY HESS: Okay. Now you said earlier that the person looked a lot like Aaron, right?
 {¶ 32} "DIANA POWELL: Yes.
 {¶ 33} "TERRY HESS: So you used Aaron somewhat as a reference in attempting to identify the person in the photo, correct?
 {¶ 34} "DIANA POWELL: That did help me to remember, yes.
 {¶ 35} "TERRY HESS: Facial features —
 {¶ 36} "DIANA POWELL: Yes.
 {¶ 37} "TERRY HESS: something along those lines, correct?
 {¶ 38} "DIANA POWELL: Yes.
 {¶ 39} "TERRY HESS: Cause you were looking for the person that looked like Aaron?
 {¶ 40} "DIANA POWELL: I was looking for the person that came out of my back window.
 {¶ 41} "TERRY HESS: Right. And that person looked like Aaron, right?
 {¶ 42} "DIANA POWELL: He does look similar to Aaron."
 {¶ 43} These portions of the transcript demonstrate that Cadiou's trial counsel thoroughly cross-examined Powell regarding her identification of Cadiou as the individual who climbed out of her window. Therefore, trial counsel's performance in this regard was not defective.
 {¶ 44} Additionally, we cannot say the results of the trial would have been different with more aggressive questioning on this topic, because Powell positively identified Cadiou as the individual in her home. At trial, Officer Stroud testified that Cadiou was a suspect based on Mangelo's assertion. However, when he compiled the lineup, he did not include the names, or any other indicators, of the individuals in the lineup. Powell testified that she did not know Cadiou prior to this offense; thus, she picked out his photograph without any prompting. Finally, we note that Mangelo's assertion that the individual was Cadiou was based on Powell's statement that the individual looked like their friend Aaron. Mangelo testified that Aaron and Cadiou have similar physical features. Also, photographs of Aaron and Cadiou were introduced at trial, so the jury was able to independently determine the degree of the similarity of the two people.
 {¶ 45} Cadiou contends that his trial counsel was ineffective for failing to object to testimony about the fact that he used to live at 4941 Wake Forest Drive. He argues that the evidence was irrelevant, because the suspect left in an automobile, and highly prejudicial, because it tainted the jury. We disagree. The fact that the suspect's car was parked in front of the house where Cadiou grew up is a relevant fact going to the issue of guilt. Even though Cadiou no longer lived in this residence at the time of the offense, the fact that he grew up in the neighborhood, and was very familiar with it, is probative to this case.
 {¶ 46} Cadiou argues that trial counsel should have attempted to elicit evidence that the footprints in the snow were not the same size as his shoes. Officer Orf testified that it was snowing on the day in question and that the footprints were filling in, which prevented the officers from taking a casting of the prints. Trial counsel questioned Officer Orf on this issue, and the officer explained that only a single, partial footprint of sufficient detail was found.
 {¶ 47} Cadiou asserts his trial counsel was ineffective for failing to show that the glove found at the scene was too small to be his. Trial counsel did cross-examine Officer Orf about the size of the glove. Specifically, counsel asked the officer whether the glove could have belonged to a woman or child. Further, Cadiou has not demonstrated he was prejudiced about the glove incident. His argument is that someone substantially smaller than himself committed the crime, because the glove was too small to fit his hand. However, Powell testified that an adult male climbed out the window, not a child or small woman. Thus, the inference is that either (1) the suspect did not wear the glove or (2) the glove was able to stretch to fit an adult male's hand. Finally, in light of Powell's two positive identifications of Cadiou as the intruder, it is doubtful that the glove evidence weighed heavily in the jury's verdict.
 {¶ 48} Cadiou contends trial counsel's performance was deficient for failing to demonstrate that his fingerprints were not found in Powell's residence. Defense counsel did ask Officer Orf about the lack of fingerprints. The officer explained that the only fingerprint found was on the Play Station 2, and it was not of sufficient quality for analysis. In addition, we note that there was evidence that the suspects wore gloves during the burglary. This fact would readily explain the lack of fingerprints in Powell's residence.
 {¶ 49} In all of the above instances, we cannot say trial counsel's performance fell below an objective level of reasonable representation.
 {¶ 50} Cadiou's final argument in this assignment of error is that trial counsel was ineffective for not calling him as a witness.
 {¶ 51} Whether a defendant testifies is a tactical decision.[3]
Since the advice of an attorney to his or her client regarding the decision to testify is a tactical decision, it is only grounds for reversal if it is shown that the decision was the result of coercion.[4] In addition, the ultimate decision of whether a defendant will testify on his own behalf is the defendant's.[5]
 {¶ 52} At trial, defense counsel informed the trial court, "I talked with [Cadiou], and he is not going to testify." This statement suggests that Cadiou ultimately decided not to testify. Thus, we cannot say counsel's performance was deficient in this regard.
 {¶ 53} Moreover, Cadiou is unable to demonstrate that he was prejudiced by this perceived error. An appellate court is limited to the record before it.[6] In addition, this court has previously held that "[i]f appellant cannot demonstrate the claimed error then we presume the regularity of the trial court proceedings and affirm the judgment."[7]
 {¶ 54} Cadiou argues that, if he had testified, he would have stated, (1) he does not own a grey sweatshirt, (2) he does not own a red car, (3) he was in Middlefield, Ohio at the time of the offense, and (4) he had a full beard at the time of the offense. None of these assertions are supported by the record before this court. Accordingly, we cannot conclude that Cadiou was prejudiced.
 {¶ 55} Cadiou has not established a successful claim of ineffective assistance of trial counsel.
 {¶ 56} Cadiou's first assignment of error is without merit.
 {¶ 57} Cadiou's second assignment of error is:
 {¶ 58} "The guilty verdict against the defendant was against the manifest weight of the evidence."
 {¶ 59} Cadiou frames his argument as his conviction is against the manifest weight of the evidence. However, in his brief, he also makes a Crim.R. 29 argument, which is more consistent with a sufficiency of the evidence challenge. When determining whether there is sufficient evidence presented to sustain a conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."[8]
 {¶ 60} In State v. Thompkins, the Supreme Court of Ohio held that sufficiency of the evidence and manifest weight of the evidence are not synonymous legal concepts.[9] Specifically, the court held "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different."[10] After reviewing the record, Cadiou's argument would fail on both a sufficiency of the evidence and a manifest weight of the evidence standard. However, since Cadiou has only assigned error regarding the manifest weight of the evidence, we will only conduct an analysis relating to that topic.
 {¶ 61} In determining whether a verdict is against the manifest weight of the evidence, the Supreme Court of Ohio has adopted the following language as a guide:
 {¶ 62} "`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'"[11]
 {¶ 63} The weight to be given to the evidence and the credibility of witnesses are primarily matters for the jury to decide.[12]
 {¶ 64} Powell identified Cadiou as the person who crawled out of the window on two occasions. She picked Cadiou's photograph out of a photographic lineup containing the pictures of Cadiou and five other individuals with similar physical features. Further, in court, she positively identified Cadiou as the person she saw leaving her home. This evidence, standing alone, is sufficient to defeat Cadiou's manifest weight challenge.
 {¶ 65} In addition, the state presented circumstantial evidence that Cadiou committed this offense. After leaving Powell's residence, the evidence demonstrated that Cadiou ran through the snow to a vehicle, which was parked in front of his childhood house. The facts that Cadiou was familiar with the neighborhood and that the getaway car was parked in front of his childhood residence makes it more likely he, rather than a total stranger, committed the offense.
 {¶ 66} Mangelo testified that Cadiou drove past Powell's residence in a red Honda automobile. When Officer Stroud ascertained the location of Cadiou's parents' new residence, he noticed a red vehicle in the driveway, which matched the description given by Mangelo. This vehicle was registered in Cadiou's mother's name.
 {¶ 67} Finally, Mangelo informed Cadiou that Powell would be out of town. This suggests Cadiou had reason to believe the house would be unoccupied on the date in question.
 {¶ 68} Cadiou makes the arguments that "the footprints at the scene were not the size of the Defendant's feet; the glove at the scene was not the size of the Defendant's hands; and the Defendant was in Middlefield, Ohio tending to his grandmother's medical needs at the time of the burglary." There is no evidence in the record to support any of these assertions.
 {¶ 69} We do not consider this a case where the jury clearly lost its way and created a miscarriage of justice. Cadiou's conviction is not against the manifest weight of the evidence.
 {¶ 70} Cadiou's second assignment of error is without merit.
 {¶ 71} The judgment of the trial court is affirmed.
DIANE V. GRENDELL, J.,
CYNTHIA WESTCOTT RICE, J., concur.
[1] State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus, adopting the test set forth in Strickland v. Washington
(1984), 466 U.S. 668.
[2] Id. at 143, quoting Strickland, 466 U.S. at 697.
[3] State v. Bey (1999), 85 Ohio St.3d 487, 499, quoting Brooks v.Tennessee (1972), 406 U.S. 605, 612.
[4] State v. Winchester, 8th Dist. No. 79739, 2002-Ohio-2130, at ¶ 12, citing Hutchins v. Garrison (C.A.4, 1983), 724 F.2d 1425, 1436, cert. denied, 464 U.S. 1065, and Lema v. United States (C.A.1, 1993),987 F.2d 48, 52-53.
[5] State v. Edwards (1997), 119 Ohio App.3d 106, 109, quotingGovernment of the Virgin Islands v. Weatherwax (C.A.3, 1996),77 F.3d 1425, citing Jones v. Barnes (1983), 463 U.S. 745, 751.
[6] See, e.g., State v. Ishmail (1978), 54 Ohio St.2d 402, paragraph one of the syllabus.
[7] State v. Davis (Dec. 4, 1998), 11th Dist. No. 97-P-0111, 1998 Ohio App. LEXIS 5810, at *2, citing Rose Chevrolet, Inc. v. Adams (1988),36 Ohio St.3d 17, 19; Knapp v. Edwards Laboratories (1980),61 Ohio St.2d 197, 199; Bucary v. Rothrock (July 13, 1990), 11th Dist. No. 89-L-14-046, 1990 Ohio App. LEXIS 2854, at *2-3.
[8] State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v. Virginia (1979), 443 U.S. 307.
[9] State v. Thompkins (1997), 78 Ohio St.3d 380, 386.
[10] Id.
[11] (Citations omitted.) State v. Thompkins,78 Ohio St.3d at 387.
[12] State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.